**UNITED STATES of America, Plaintiff,**

v.

**Jose REYES, Francisco Medina, and Thomas Rodriguez, Defendants.**

No. S2 94 CR 872 (SAS).

United States District Court, S.D. New York.

Jan. 3, 1996.

Bruce G. Ohr and Thomas A. Arena, Assistant U.S. Attorneys, United States Attorney's Office, Southern District of New York, New York City, for Plaintiff U.S.

Diarmuid White, New York City and Don D. Buchwald, Buchwald & Kaufman, New York City, for Defendant Jose Reyes.

Lee Ginsberg, Freeman, Nooter & Ginsberg, New York City, for Defendant Thomas Rodriguez.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### INTRODUCTION

Defendant Jose Reyes ("Reyes") has filed pretrial motions seeking various forms of

relief. Defendant Thomas Rodriguez ("Rodriguez") has joined in these motions to the extent they affect him and has also asked that his case be consolidated with a different pending case, or, in the alternative, that he be granted a severance.[1] After the submission of extensive briefs on the issues raised, a number of the motions were resolved. *See generally* Transcript of Proceedings, September 1, 1995. An evidentiary hearing was then held with respect to several of the remaining issues on October 5, 6, and 20, 1995. Post-trial briefs were submitted following the hearing. Before addressing the motions, I shall list the remaining issues and set forth the relevant facts.

Reyes first moves to suppress the fruits of four searches made pursuant to search warrants issued by a Magistrate Judge in Florida.[2] The heart of that motion is that probable cause to search was lacking because the information in the affidavits was stale. Reyes also challenges the initial entry into his hotel room, pursuant to a duly issued arrest warrant; that entry provided some of the material included in the search warrant affidavits. This challenge is based on Reyes' contention that the entry into the room was illegal because the agents could not reasonably have believed that Reyes was in the room and/or that they failed to announce their presence when they knocked on the door. Reyes next moves to suppress the fruits of the "search" of three electronic paging devices, found in various locations. With respect to two of those pagers, Reyes asserts that the pagers were wrongfully seized and/or should not have been accessed. The third pager was seized from the hotel lost and found pursuant to one of the allegedly defective warrants. Finally, Reyes seeks to suppress statements he made during questioning by law enforcement agents following his arrest. Reyes argues that while the waiver of his rights was knowing, it was not voluntary given the lapse of time between arrest and arraignment and his deteriorating medical condition.[3]

## FACTUAL BACKGROUND

On November 16, 1994, Reyes was indicted for narcotics-related offenses by a grand jury sitting in the Southern District of New York. An arrest warrant was contemporaneously issued. On Friday, December 2, 1994, the Bureau of Alcohol, Tobacco and Firearms ("ATF") received information that Reyes might be staying in the Airport Hilton Hotel in Miami, Florida. *See* Transcript of Hearing ("Tr.") at 202. A copy of the arrest warrant and a picture of Reyes were faxed to ATF agents in Miami. Tr. at 203. The Miami agents knew that Reyes was a paraplegic confined to a wheelchair. Tr. at 90.

### I. *The Entry into Reyes' Hotel Room*

On the evening of December 2, 1994, four ATF agents (Davis, O'Keefe, Foster and Lawrence) proceeded to the Airport Hilton. Tr. at 33–34. The record is not clear as to when they arrived, but it would appear to be after 6 p.m. on Friday evening. *See generally* Tr. at 30. They learned from a desk clerk that Reyes was a guest at the hotel staying in Room 609. Tr. at 33. The record is unclear as to whether the agents knew or should have known that Reyes was not in his room at the time. In any event, after the agents knocked on the door and phoned the room, with no response to either, a hotel security guard opened the door to the room. The four agents entered the room and conducted a security sweep. Tr. at 16, 80, 93. They observed clothes, books, magazines,

---

1. Defendant Francisco Medina is a fugitive. As a result, he has not made or joined in any motions.

2. Three warrants, issued on December 4, 1994, permitted searches of the Sharp Wizard computer seized from Reyes at the time of his arrest; the hotel's lost and found storage vault, where the contents of Reyes' room were moved by the hotel; and a unit of a mini-storage facility in Miami. The fourth warrant, issued several days later, authorized an additional search of the mini-storage facility.

3. The other points raised by Reyes merit only brief discussion. Reyes seeks to strike certain language in the Indictment as prejudicial surplusage. He also challenges 21 U.S.C. § 848(b)(2)(A) as being unconstitutionally vague. Finally, Reyes and Rodriguez both seek a *Wade* hearing with respect to certain identification procedures employed by the Government. *See* pp. 839–840, *infra*.

and medical accessories. Tr. at 15, 93–94. No one was inside the room. Tr. at 16, 93–94. The agents removed nothing from the room. However, the agents' observation of *Soldier of Fortune* magazine and a book entitled *Hitman* in Reyes' hotel room was included in the subsequent affidavits for search warrants.

## II. *Reyes' Arrest and the Search of the Car*

Later on the evening of December 2, 1994, Reyes returned to the hotel in a Lincoln Town Car driven by Victor Salazar. Salazar helped Reyes into his wheelchair and pushed him into the hotel. Reyes was then arrested in the hotel lobby. Tr. at 94. Reyes identified himself as Benjamin Polanco, not Jose Reyes. *Id.* The agents recovered a bag attached to Reyes' wheelchair containing a Sharp Wizard computer and a pager. Tr. at 95. A search warrant was later obtained to search the files of the Sharp Wizard computer. As noted earlier, Reyes challenges the warrantless retrieval of information contained in the pager seized from the bag on his wheelchair.

Two other ATF agents, Murphy and Coad, separated Salazar from Reyes. Salazar gave the agents permission to search the car. Tr. at 117–118. A pager was found in the back seat of the car and two receipts were found in the glove compartment—one for the car rental and one for ABC Mini Storage. Both receipts were in the name of Alejandra Posada. Tr. at 119, 144. When asked to whom the receipts belonged, Salazar responded that "[t]hose receipts belong to him [Reyes]. You'll have to ask him." Tr. at 119, 145. After the seizure, Agent Murphy may have informed Agent Davis that he thought Alejandra Posada might be an alias used by Reyes. Tr. at 133. Once again, Reyes challenges the warrantless retrieval of information contained in the pager seized from the car.

Agents Davis and O'Keefe then transported Reyes to the Metropolitan Correction Center ("MCC") outside Miami. When Agent Davis filled out a personal history form for Reyes she listed the name "Alejandro Posada" as an alias. Reyes was lodged at the MCC. Tr. at 20–22.

## III. *The Search Warrants*

On Sunday, December 4, 1994, Agent Davis, together with case Agent Horne and two investigators from New York, went to the Miami U.S. Attorney's office where search warrants were being drafted. The drafting began with an e-mailed draft prepared in New York by Assistant U.S. Attorney ("AUSA") Tom Clark. Tr. at 25, 207, 313–14. This draft was then revised by local AUSA Jose Boneau. Tr. at 318. The agents spoke with both AUSAs. Both Agents Horne and Davis reviewed the draft warrants before they were presented to the Magistrate Judge. Tr. at 25–27, 207–11. The warrants were issued later that evening. The agents searched the ABC Mini–Storage and the hotel lost and found that same night. The search of the Sharp computer was conducted the next day. Several days later, on December 7, a fourth warrant was issued. That warrant authorized a second search of the ABC Mini–Storage locker.

## IV. *The Interview of Reyes*

After the warrants were signed, Agent Horne and two New York investigators went to the MCC to interview Reyes. Tr. at 180, 213. When Reyes entered the visitors room, the agents identified themselves and Agent Horne read Reyes his *Miranda* rights. Reyes signed a piece of paper to which the card containing the *Miranda* rights had been stapled, acknowledging that he had received and understood his rights. Government Exhibit ("GX") 5 (waiver of rights); Tr. at 182, 214, 354. Reyes then spoke with the agents.

## V. *The Recovery of the Third Pager and Reyes' Arraignment*

A third pager was recovered from the search of Reyes' belongings that had been moved to the hotel lost and found. Tr. at 159, 219. The parties dispute whether the pager was on or off when it was found. In any event, Agent Horne kept the pager in her room overnight. Tr. at 160, 219. The next morning, during a meeting with the other agents in her hotel room, the pager went off, and the investigators recovered the messages from the pager over the course of

the next four days. Tr. at 161, 168. Later that morning (Monday), Reyes was arraigned in federal court in Miami. A woman identified as Alejandra Posada attended the arraignment. Tr. at 162, 220, 221.

## DISCUSSION

### I. *The Entry into Reyes' Hotel Room*

Reyes asserts that the ATF agents acted unlawfully when they entered his room at the Miami Hilton to execute an arrest warrant. Because facts observed by the agents while in the room were used in the affidavits supporting four search warrants, Reyes argues that the evidence seized pursuant to those warrants must be suppressed.

■ Section 3109 of Title 18, United States Code, states in part:

> The officer may break open any outer or inner door or window of a house or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance....

The restrictions which § 3109 imposes on law enforcement officers are of constitutional dimension. *Wilson v. Arkansas,* —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). Section 3109 has been held to apply to arrest warrants, *Sabbath v. United States,* 391 U.S. 585, 588, 88 S.Ct. 1755, 1757, 20 L.Ed.2d 828 (1968), and to hotel or motel rooms, *United States v. Nolan,* 530 F.Supp. 386, 392–93 (W.D.Pa.1981), *aff'd,* 718 F.2d 589 (3d Cir. 1983). Finally, a hotel employee may not provide lawful consent to police entry into the hotel room of a guest. *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964).

■ The statutory requirement that agents be "refused admittance" before forcing an entry does not require an affirmative refusal, but is satisfied when the circumstances permit the agents to reasonably infer that they have been refused admittance. *See, e.g., United States v. Ramos,* 923 F.2d 1346, 1356 (9th Cir.1991); *United States v. Bonner,* 874 F.2d 822, 824 (D.C.Cir.1989); *United States v. Williams,* 573 F.2d 348, 350 (5th Cir.1978); *United States v. James,* 528 F.2d 999, 1017 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *Masiello v. United States,* 317 F.2d 121, 122 (D.C.Cir.1963). Thus, the question here is whether the ATF agents reasonably inferred that they had been refused admittance when they entered Reyes' hotel room. If such an inference was unreasonable, then the entry was illegal, and the fruits of the search must be suppressed.

Agent Davis testified that she knocked on the door of Room 609 at approximately 9 or 9:30 p.m. and announced that she was a federal agent with an arrest warrant. She further testified that she heard a TV on in the room, and that its volume was so loud that she had to scream when she made her announcement. After receiving no response, she telephoned the room from a house phone. Again she received no response. She then went to the lobby and got a security guard to accompany her back to the room with a set of keys. The guard then knocked on the door and identified himself. When nobody answered, he opened the door with a key. The television set was on, but no one was in the room. *See generally* Tr. at 15–16, 38–40.

There is significant evidence in the record contradicting Agent Davis' account. Agent O'Keefe, who accompanied Agent Davis, testified that when they first came to the room, they knocked but did not announce themselves. When Agent Davis placed the phone call to the room, Agent O'Keefe could hear the phone ring, raising an issue as to the volume of the TV. Tr. at 92, 102, 105–06. In addition, although Agent Davis testified that she screamed her announcement at the door of Reyes' hotel room, and although there were other hotel room doors across the hall and 5–10 feet to the right of the door to Reyes' room, no one in any other rooms in the area came to his or her door. Tr. at 38–39. Mr. Iadanza, the hotel security officer, testified that at about 9:30 p.m., two officers came to the lobby with a picture of Reyes. Mr. Iadanza recognized Reyes as a guest and told the officers that he had not seen Reyes that day. The agents asked if they could gain access to the room to see if Reyes was there. Mr. Iadanza then accompanied them to the room, knocked, identified himself as security and opened the door. Mr. Iadanza

could not recall whether the TV was on. Tr. at 79–81.

Agent Murphy testified that within 15 minutes of his arrival at the hotel, Agent Davis told him that Reyes was not at the hotel. Tr. at 115, 127. While Agent Murphy was unsure of the time of his arrival at the hotel, he did state that it was just starting to get dark. Tr. at 126. The testimony of Agent Davis reveals that on December 2, 1994, it started to get dark at approximately 6:30 p.m. Tr. at 43. Finally, Reyes testified that he had turned the TV off when he left the room (he left at approximately 1 p.m., and did not intend to return until 10 p.m.). He further testified that it was his usual habit to turn off the TV when he was leaving the hotel room, and that he acted in accordance with that practice. Tr. at 346–348.

I credit the testimony of Agent O'Keefe that the first time the agents went to the door, they merely knocked. There is no reason for a hotel guest not to respond to a knock. There is even less reason for a hotel guest not to answer a phone call. It further appears that Agent Davis told Agent Murphy that Reyes was not in the hotel before she entered the room. According to both Agent Davis and Mr. Iadanza, the agents entered the hotel room at 9 or 9:30 p.m. On the other hand, Agent Murphy appears to have arrived at the hotel at about 6:30 p.m. The sequence of these events is confusing.

Finally, the only neutral witness, Mr. Iadanza, testified that it was approximately 9:30 p.m. when the agents came to the lobby and asked if he had seen the person depicted in a photograph of Reyes. Tr. at 79. Mr. Iadanza could not recall whether the TV was on either when he was in the hall knocking at the door or when he entered the room. Tr. at 81, 87. When combined with Agent O'Keefe's testimony that he heard the phone ringing through the closed door, with Reyes' testimony that the TV was off and that he planned to be out for close to nine hours, and with the equivocal wording of the search warrant "[h]earing a television set they believed to be on inside the room," I find it more likely than not that the TV set was not on. The inference to be drawn from this finding is that the agents did not reasonably believe that they had been refused admittance to the room.[4]

This case is easily distinguishable from the many cases cited by the parties in which a failure to answer a knock and announce may be deemed a constructive refusal to admit. *See, e.g., United States v. Bonner,* 874 F.2d 822, 824–25 (D.C.Cir.1989) (refusal where police knew suspects were inside apartment, twice knocked and announced, and heard footsteps running from door as well as thumping or bumping); *United States v. Williams,* 573 F.2d 348, 350 (5th Cir.1978) (refusal where no response to knock, but defendant's cars were parked outside the house); *United States v. James,* 528 F.2d 999, 1017 (5th. Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976) (where reliable informant advised that fugitive was at premises, and police, in plain view, announced purpose over bullhorn, failure to respond was tantamount to refusal); *cf. United States v. Nolan,* 718 F.2d 589, 597 (3d Cir.1983) (where marshals heard sound of TV or radio inside motel room *and* motel manager told them suspect had returned to room after re-registering an hour and a half earlier, it was reasonable to conclude that defendant was in the room and might escape, and exigent circumstances existed; however, agents violated § 3109 by failing to knock and announce). The case is similar, however, to *United States v. Watson,* 307 F.Supp. 173, 175–76 (D.D.C.1969), where the court held that if an officer knocks on the door of a house he has reason to believe is unoccupied, he cannot reasonably conclude from the nonresponse that he has been refused admittance.

Thus, the entry into Reyes' hotel room was unlawful. As a result, the fruits of that search must be suppressed. The reference to the evidence illegally obtained from Reyes'

---

**4.** Courts have sustained officers who interpreted ambiguous noises from within the place to be searched as evidence that they were being refused entry. *See, e.g., United States v. Allende,* 486 F.2d 1351, 1353 (9th Cir.1973), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974) (officers heard scampering sounds); *Masiello,* 317 F.2d at 122 (officer heard rustling or other commotion inside the room).

hotel room will be addressed in the next section.

## II. *Validity of the Search Warrants*

### A. Summary of Information in Search Warrant Affidavits

The affidavits in support of the three warrants issued on December 4 [5] contained essentially identical information.[6] For convenience, I will cite to the Affidavit of Agent Laurie Horne in Support of Application for Search Warrant for ABC Mini–Storage, Dec. 4, 1994 (hereinafter "Horne Aff."). The content of the affidavits can be divided into two categories—information related to narcotics trafficking at a location designated as 1770 Andrews Avenue in the Bronx ("1770") (Horne Aff. ¶¶ 3–18) and information related to Jose Reyes (*id.* ¶¶ 19–30). The following is my summary of the information in the first category:

> Two confidential informants had been providing information to the ATF since December 1992. On four occasions in June and July 1992, undercover agents bought heroin in the vicinity of 1770. In July 1992, crack cocaine and heroin were seized from 1770, together with notebooks and a handgun. On August 31, 1992, Ambiore Perez was arrested near 1770 with a large amount of crack. CI–2 identified Perez as a "former manager" of crack distribution from 1770. On January 29, 1993, two people were arrested near 1770 with 5 kilograms of cocaine. CI–2 identified these two as "members of the organization distributing drugs from this location." Horne Aff. ¶ 15. CI–2 stated that the organization began distributing drugs as early as 1989 and is still doing so. As recently as November 15, 1994, agents observed persons (identified by CI–2 as members of the organization) engaging in hand to hand transfers with other people. On Novem-

ber 16 and 18, 1994, agents bought heroin in the vicinity of 1770.

The following is my summary of the information contained in the second category:

> CI–1 and CI–2 have identified Reyes "as the person they *knew* to be the overall 'boss' of the drug distribution organization dealing from 1770...." Horne Aff. ¶ 19 (emphasis added). A third informant, CI–3, believed that he was employed by a drug distribution group led by Jose Llaca. CI–3 distributed drugs with Llaca from 1991 until June 1993 in quantities ranging from 3 to 4 kilograms of crack per week. CI–3 saw Llaca meet "Jay," a crippled person who had another person drive a van for him. CI–3 saw Llaca retrieve kilograms of cocaine from that van on many occasions. Reyes is paralyzed, having been shot in 1992. In October 1992, agents surveilled Reyes to a New Jersey hotel, where he stayed in a room rented by his driver. The driver's credit card reflected at least two airline tickets purchased in Reyes' name and rentals of many handicapped equipped hotel rooms in various locations. Hotel records also reflected phone calls to a store in New York identified by various persons (not named) as a place out of which Reyes had distributed drugs. Cash Transaction Report records revealed that Reyes' driver deposited $33,000 one day with a New Jersey bank and purchased a handicapped-equipped Volvo in New Jersey on the same date (no date was supplied for this transaction). Agent Horne believed that Reyes' driver used his credit card "since August, 1991" to charge thousands of dollars of Reyes' expenses. Horne Aff. ¶ 26. Reyes was found in Miami through phone records showing a call from the hotel to "a telephone number of an associate believed to be in communication with Reyes." *Id.* ¶ 27. While Reyes admitted he was the person in a prior arrest photo of Jose Reyes, he identified

---

**5.** In Section III, *infra*, I address the validity of the fourth warrant, which permitted a second search of the ABC Mini–Storage locker.

**6.** The affidavit in support of the warrant to search the computer indicated that it had been seized from a bag attached to Reyes' wheelchair at the time of his arrest and that drug traffickers

can store drug-related information in such computers. The affidavit in support of the warrant to search the hotel lost and found alleged that Salazar and a person who identified herself as Alejandra Posada had unsuccessfully asked the hotel to release the property which had been in the room rented in Salazar's name.

himself as Benjamin Polanco and later as Alejandro Posada. The room at the Miami Hilton was rented since November 15, 1994 in the name of Victor Salazar, Reyes' driver, who had paid for the room with $1,000 in cash. Before arresting Reyes, the agents found *Soldier of Fortune* magazine and a book entitled *Hitman* in that room. "NYPD has developed evidence it believes to be credible" that Reyes will pay thousands of dollars for the murder of witnesses against Llaca (then on trial in New York). *Id.* ¶ 29. Llaca had allegedly given this information to "various persons, both inside and outside prison...." *Id.* Salazar said he was driving a car rented by Alejandro Posada and consented to a search of that car. A current receipt in that name for rental of a mini-storage unit was found in the car. According to interviews with unidentified persons involved in narcotics trafficking, Reyes is not employed. Finally, Agent Horne has "not received any information indicating that Reyes has ceased his association with the organization that operates from the vicinity of 1770...." *Id.* ¶ 31. Based on her review of all information available to her, Agent Horne concluded that Reyes has access to substantial sums of cash.

### B. Some of the Information in the Affidavits Was Old

■ The first issue to be addressed is whether the information contained in these affidavits was stale. "In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.,* true at the time of the application, or whether instead it has become stale." *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991).

■ Informants identified Reyes "as the person they *knew* to be the overall 'boss' of the drug distribution organization." Horne Aff. ¶ 19 (emphasis added). The time frame of this past knowledge is not provided, although the affidavit states that they began to provide information in December 1992. CI–3 saw Llaca meet with "Jay," a crippled individual, and retrieve kilograms of cocaine

from his van during the period 1991 until June 1993. Thus, the informant information was 18 months old at the time the search warrants were issued. The agents' surveillance of Reyes to New Jersey occurred in October 1992. His driver's credit card records reveal substantial sums spent by Reyes since August 1991, but the affidavit does not state how current those records are. The same is true of the records of phone calls from hotel rooms to stores in New York. The allegation concerning the cash transfer for the purpose of purchasing the Volvo provides no date. Testimony provided at the hearing revealed that the date of this transaction was October 1992, and that Agent Horne knew this date some time before she signed the affidavits in support of the search warrants. Tr. at 210.

### C. Defining Staleness

The next question, then, is when does information become stale. In *United States v. Rowell,* 903 F.2d 899, 903 (2d Cir.1990), the court held that even an 18–month delay between information provided by informants and the application for a wiretap did not make the information too stale to be relied upon. However, in that case, the defendant had made statements to an undercover officer about his *ongoing* marijuana distribution operation, thereby corroborating the information from the informants. *Id.*

In *United States v. Benevento,* 649 F.Supp. 1379, 1382–84 (S.D.N.Y.1986), *aff'd in part, vacated in part,* 836 F.2d 60 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988), the court held that there was probable cause to search the defendant's home despite a one-year gap between the date of the information in the affidavit and the date of the warrant application. This decision is noteworthy in two respects. First, it may be read to hold that no more than one year may elapse if information is to be considered current rather than stale. Second, the warrant was to search a home, a place in which evidence of past criminal activity is likely to be found. Finally, and most importantly, the warrant application identified the date of the criminal activity as occurring prior to June 1985, thereby

attempting to demonstrate probable cause to believe that certain specified items relating to past crimes were still at the home. *Benevento*, 649 F.Supp. at 1383–84.

In *United States v. Perry*, 643 F.2d 38, 49–50 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981), the court upheld a warrant based on an affidavit revealing a three-year gap between evidence of narcotics activity on both sides of the gap. There, the court held that the earlier activity was not stale because of the proof of the later (current) activity. The later evidence included statements of identified witnesses to the effect that the defendant conducted business from an unoccupied location, as well as pictures from surveillance cameras revealing automobiles (which would leave whenever the police arrived) linked to drug traffickers in the driveway.

In *Rivera*, the court noted that "intervals of *weeks or months* ... [do] not necessarily make the information stale." 928 F.2d at 602 (emphasis added). *See also United States v. Ponce*, 947 F.2d 646, 650 (2d Cir.1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992) (information two weeks old not stale); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) (five weeks not stale); *United States v. Martino*, 664 F.2d 860, 867 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (22 days not stale).

■ Thus, while there is no bright line for defining staleness, the information necessary to support a finding of probable cause should be no older than one year (assuming that one year is the outer limit for a reasonable interpretation of the *Rivera* court's designation of "weeks or months," and assuming that there are no allegations of current activity that would corroborate or update information older than one year).

### D. Information in the Reyes Affidavits Was Stale

It is axiomatic that once a neutral and detached Magistrate has issued a warrant, generally that "finding of probable cause is entitled to substantial deference." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983); *see also United States v. Ventresca*, 380 U.S. 102, 105–09, 85 S.Ct. 741, 744–46, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 110–11, 84 S.Ct. 1509, 1511–12, 12 L.Ed.2d 723 (1964). Nonetheless, in this case, I conclude that the information in these search warrant affidavits was stale as to Reyes' involvement in the alleged criminal activity.

### E. Some of the Information in the Affidavits Is Unreliable

As neither the allegations based on the statements of the confidential informants nor the information resulting from the agents' surveillance and review of records provides any evidence of criminal activity by Reyes during the past 18 months, the only remaining sources for current information are the allegations concerning the information obtained at or around the time of Reyes' arrest. Several of those allegations have no indicia of reliability and cannot support a finding of probable cause. That Reyes was located by phone records showing a call from the hotel to a telephone number of an "associate" has no meaning. The "associate" is never identified, and there is no information establishing that the "associate" is involved in criminal activity. Thus "associate" is merely a loaded word. Similarly, references to persons who are allegedly involved in the narcotics trade with Reyes, and who stated that he is not employed, cannot be credited, as no such persons are identified and no dates provided with respect to their statements. Such allegations amount to no more than unsubstantiated rumor. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Finally, the information concerning Reyes' current offer to pay money for the murder of witnesses against Llaca is not credible for the same reason. The evidence believed to be credible by the NYPD is never identified, nor are the persons (both inside and outside prison) identified who provided such information. This again is unsubstantiated rumor.

### F. Some of the Information in the Affidavits Is Tainted

Moreover, the affidavits presented to the Magistrate Judge contained information

gained from an illegal search. *See* pp. 822–25, 826, *supra.* Paragraph 28 of each affidavit details the search of Reyes' hotel room and the observation in that room of *Soldier of Fortune* and *Hitman.*

### G. Remaining Information in the Affidavits Provides No Current Evidence of Criminal Activity and Thus Does Not Support a Finding of Probable Cause

The remaining allegations from the time of the arrest are (1) that Reyes identified himself as Benjamin Polanco and then as Alejandro Posada (though it is now conceded that Reyes never identified himself as Alejandro Posada); and (2) that the room at the hotel had been rented for two weeks with a $1,000 cash payment. Neither of these allegations, viewed separately or in combination, provides current evidence of narcotics trafficking or other criminal activity by Reyes, nor do they corroborate the earlier information of such activity. Finally, Horne's statement that she had "not received any information indicating that Reyes has *ceased* his association with the organization that operates from the vicinity of 1770 Andrews Avenue" (Horne Aff. ¶ 31 (emphasis added)) appears to be added to imply continuity where none exists for the sole purpose of bringing the older allegations up to date.

### H. There Was No Substantial Basis for a Finding of Probable Cause

■ In determining whether probable cause exists to believe that evidence of a crime is presently to be found in a certain place, a court must consider the totality of the circumstances. *See Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. Where an issuing "magistrate relied in part on improper information," a reviewing court must decide independently whether probable cause existed to issue a search warrant. *United States v. Thomas,* 757 F.2d 1359, 1368 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). Further, this court's independent determination must rely only on the information in the affidavits which was not gained from an illegal search.[7] "When

an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." *Laaman v. United States,* 973 F.2d 107, 115 (2d Cir.1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). *See also United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987); *United States v. Whitehorn,* 829 F.2d 1225, 1231 (2d Cir.1987); *United States v. Levasseur,* 816 F.2d 37, 43 (2d Cir.1987); *United States v. Taborda,* 635 F.2d 131, 140 (2d Cir.1980). Because most of the remaining, untainted information in these search warrants was stale as to Reyes' involvement in narcotics trafficking or other criminal activity (*see* p. 827, *supra* ), I find that the issuing judicial officer did not have a substantial basis to find that there was a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. In short, there was no substantial basis for the Magistrate's finding of probable cause. *See United States v. Wagner,* 989 F.2d 69, 72 (2d Cir.1993) (citing *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331). The court's inquiry, however, is not yet concluded.

### I. The Good Faith Exception

■ Despite the staleness of the affidavits presented to the Magistrate, and the presence in the supporting affidavits of information gained through an illegal search of Reyes' hotel room, if the agents executed the warrants in good faith reliance as to their validity, then suppression of the evidence gleaned from the searches would not be required. *United States v. Cancelmo,* 64 F.3d 804, 807 (2d Cir.1995); *United States v. Smith,* 9 F.3d 1007, 1015 (2d Cir.1993); *see also United States v. Londono,* 659 F.Supp. 758, 764 (E.D.N.Y.1987), *aff'd sub nom. United States v. Carmona,* 858 F.2d 66 (2d Cir. 1988).

In creating a good faith exception to the exclusionary rule, the Supreme Court has identified circumstances that would not justify reliance on a warrant. In particular, the Court has noted that an executing officer's

---

**7.** I am mindful of the fact that the information about *Soldier of Fortune* and *Hitman* constituted just half a page in affidavits ranging from 15 to 17 pages.

reliance on a warrant could not be in good faith (1) where the affiant knowingly or recklessly misled the issuing magistrate; "(2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore,* 968 F.2d 216, 222 (2d Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992) (citing *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984)).

■■■ The exclusionary rule should be narrowly confined to situations in which its application is necessary to deter official misconduct. Thus, the harsh remedy of suppression should not be applied where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon,* 468 U.S. at 922, 104 S.Ct. at 3420. The Government bears the burden of demonstrating the objective reasonableness of the officer's good faith reliance on the validity of the warrant. *United States v. George,* 975 F.2d 72, 77 (2d Cir.1992).

#### 1. The Lack of Probable Cause

■■■ The testimony at the suppression hearing demonstrates that Agent Horne and her colleagues knew or should have known that the information in the affidavits was stale. That is, they knew or should have known that the affidavits did not establish probable cause to believe that the evidence to be seized (narcotics, records of narcotics transactions, etc.) was presently at any of the specified locations. Although Agent Horne had been involved in the 1770 investigation since April 1992, she did not learn of Reyes' role before July 1994. Tr. at 243. Reyes' criminal activity in connection with narcotics trafficking was alleged to have occurred in 1992 and the early half of 1993. The only "evidence" of current illegal activity by Reyes was patently unreliable. *See* p. 827, *supra.* Agent Horne's conclusion that the information in the warrant was not stale was not objectively reasonable.

#### 2. False or Misleading Information

In what appears to be a lame attempt to beef up stale information, the affidavits contained one false statement and one misleading statement. The false statement is conceded—Reyes never identified himself as Alejandra (or Alejandro) Posada. The Government argues, however, that this false statement was made accidentally, as opposed to intentionally or recklessly. The misleading statement concerns the omission of the date on which the Volvo was purchased for $33,000 in cash. This omission might have caused the Magistrate to conclude that this large cash transaction had occurred at some time proximate to the application for the warrants.

##### a. *The False Information*

ATF agents found two receipts in the name Alejandra Posada (a female name) in the Town Car on December 2, the night of the arrest. One receipt was for the rental of the car and the other was for the rental of a locker at the ABC Mini–Storage. Salazar, Reyes' driver, told the agents that the receipts belonged to Reyes and they would have to ask Reyes about these receipts. Tr. at 119. Salazar never identified Reyes as Alejandra or Alejandro Posada, nor did Reyes ever identify himself with either of those names. Indeed, he identified himself as Benjamin Polanco. Tr. at 365. Nonetheless, when Agent Davis prepared the personal history form to lodge Reyes at the MCC, she listed Alejandro Posada as an alias. Tr. at 21. Curiously, she did not list Benjamin Polanco as an additional alias. *See* GX 2. On December 3 or 4, prior to obtaining the warrants, Agent Davis learned that Alejandra Posada had come to the hotel to retrieve Reyes' property. Tr. at 70. Agent Davis informed the AUSA in New York of this fact and he instructed her to tell the hotel employees not to return any property until a warrant was issued. Tr. at 312. Thus, there is no doubt that the agents and both AUSAs knew, prior to submitting the warrant applications, that a woman named Alejandra Posada existed and that she was a friend or associate of Reyes. Under those circumstances, the statements in paragraphs 27 and

30 of the affidavits were at best made with reckless disregard for the facts.

### b. *The Misleading Information*

Both Agent Horne and the AUSA who originally drafted the warrant applications explained that the date of the Volvo purchase was simply not available, because Agent Horne's file was in New York, Agent Horne was in Florida, and the AUSA was not entirely familiar with all of the evidence accumulated in the investigation. Tr. at 210–11, 305. However, the allegation as presented in the final draft of the affidavit does leave the impression that the information is recent, if not current. As Agent Horne testified, although she could not recall the date at the time the affidavits were drafted, she knew the actual date at some time prior to December 1994. Tr. at 210. I conclude, under all the circumstances, that the omission was misleading.

### 3. The Hotel Room Search

I have already found that the agents had no reasonable basis to conclude that they had been refused admittance in response to their knock and announcement at the hotel room door. Based on this finding, it is apparent that the agents "knowingly or recklessly" misled the issuing Magistrate by placing tainted evidence in the affidavits. At least two decisions from this circuit address situations in which law enforcement agents sought the benefit of the good faith exception where the fruits of illegal searches were used in affidavits in support of warrant applications. However, as described below, in neither of those cases did the courts find that the agents knowingly or recklessly misled the issuing Magistrate.

In *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), the defendant's apartment was searched pursuant to a warrant issued by a Magistrate who found probable cause based on an affidavit stating the results of a "dog sniff" outside the apartment. *Id.* at 1366. The Second Circuit held that the dog sniff violated the Fourth Amendment, and that the result of the sniff should therefore not have been included in the affidavit in support of the warrant appli-

cation. Without the dog's alert, the court found that there was insufficient basis for issuing the warrant. *Id.* at 1367. However, the court then considered "whether the agent who conducted the search acted in good faith reliance on the search warrant," as *Leon* requires in order for the good faith exception to apply. *Id.* at 1368. Because the DEA agent brought his evidence to a neutral and detached Magistrate, who determined that probable cause existed and who issued a search warrant, there was "nothing more the officer could have or should have done under these circumstances to be sure his search would be legal." *Id.* at 1368.

*Thomas* is easily distinguishable from the instant case. In *Thomas*, the agents who initiated the dog sniff were not unreasonable in thinking the sniff was constitutional. For one thing, the Supreme Court has held that dog sniffs at airports do not constitute a search. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). Moreover, the agents in *Thomas* used a dog outside the defendant's apartment, rather than inside it. Although the court ultimately decided that the sniff infringed the defendant's reasonable expectation of privacy in his dwelling, the agents nonetheless did not act in bad faith when they nosed around outside the apartment. By contrast, as I have described above, the agents in this case could not reasonably have believed that Reyes was in his hotel room when they entered the room. Consequently, their search of the hotel room was not in good faith, and they may not now claim good faith reliance on the fruits of that search in order to obtain search warrants.

Another case from this circuit, *United States v. Londono*, 659 F.Supp. 758 (E.D.N.Y.1987), *aff'd sub nom. United States v. Carmona*, 858 F.2d 66 (2d Cir.1988), addressed the good faith exception in the context of a search warrant application containing information gained through an illegal search. In that case, officers arrested the defendant inside his home and legitimately conducted a security sweep to ensure that no one else was present. *Id.* at 760, 762. During that sweep, an officer noticed a block-shaped object in a gap above a door. The

officer flicked it with his finger, the object fell to the ground, and the officer determined that the object was a package of currency totaling $10,300. *Id.* at 760. In applying for a warrant to search the house, the officer included the finding of cash in his affidavit. *Id.* at 761.

In light of a subsequent Supreme Court case, the court found that the seizure of the $10,300 could not be justified by the plain view doctrine.[8] *Id.* at 762. Without considering the cash, the court further found that the warrant application did not support probable cause. *Id.* at 763. However, the court went on to apply the good faith exception, determining that "the officers acted in an objectively reasonable manner" in seizing the cash, and that their actions were "probably legal under the law of this Circuit as it stood at the time." *Id.* at 764.

Because I have found that the agents who entered and searched Reyes' hotel room did not act in an objectively reasonable manner, I decline to apply the good faith exception that would allow the agents to rely on search warrants that were issued in part based on the fruits of the hotel room search. *See United States v. Vasey,* 834 F.2d 782, 789 (9th Cir.1987) (declining to apply good faith exception where warrant application was based on items found during warrantless search of vehicle that could not be justified as a search incident to arrest). Accordingly, Reyes' motion to suppress the fruits of the searches based on Horne's affidavits must be granted.[9]

III. *Validity of the Fourth Warrant*

On December 7, 1994, the Magistrate issued a warrant permitting a second search of the ABC Mini–Storage locker. The application for this warrant incorporated the December 4 affidavits by reference and added two additional paragraphs. The first, para-

graph 4, recited the results of the first search of the locker pursuant to the warrant issued on December 4. The second, paragraph 6, declared that the affiant was present in court when Reyes stated he had no assets. Thus, the affiant concluded that items viewed in the storage facility (but not seized), such as fancy clothes and shoes, were in fact evidence of Reyes' criminal activity.

Given this Court's finding that the December 4 warrant failed to state probable cause and that the warrant was not obtained in good faith, the fruits of that search must be suppressed. Thus, the only new untainted allegation in the second affidavit is that Reyes stated in court that he had no assets. This allegation does not state sufficient probable cause to believe that the items in the storage facility rented by Alejandra Posada, viewed by the agents during the first search, are evidence of Reyes' alleged criminal activity. The evidence seized in this subsequent search of the storage facility must also be suppressed.

IV. *Numbers/Messages Obtained from the Pagers*

A. Facts Surrounding Seizure of Pagers and Accessing of Pagers' Memory

At the time of Reyes' arrest, the agents seized from Reyes' wheelchair a bag containing (among other things) a telephone paging device (hereinafter "pager"). Tr. at 18, 95. This pager shall be referred to as Pager # 1. The search of the car in which Reyes arrived at the hotel on the night of his arrest yielded, among other things, another pager. Tr. at 144. This pager shall be referred to as Pager # 2. When Agents Murphy and Coad finished searching the car, Pager # 1 sounded (with a beeping noise). Tr. at 122, 135, 145. Murphy handed the pagers to Coad. Tr. at 122. Coad, who testified that both

---

8. In *Arizona v. Hicks,* 480 U.S. 321, 324–35, 107 S.Ct. 1149, 1152–58, 94 L.Ed.2d 347 (1987), the Court held that merely moving an object is itself a search and requires probable cause. Seizures cannot be justified under the plain view doctrine "if the item must be moved even slightly in order to discern its incriminatory nature." *Londono,* 659 F.Supp. at 762 (citing *Hicks* ).

9. To be clear, I determine that the good faith exception is inapplicable only under the first circumstance enumerated in *Leon:* the affiants knowingly or recklessly misled the Magistrate. There is no evidence that the Magistrate abandoned his neutral role, that the affidavit was so lacking in indicia of probable cause as to render reliance upon it unreasonable, or that the warrant was facially invalid.

pagers were on, pressed a button on each pager. Tr. at 149. Coad then read the numbers revealed on each pager, and Murphy wrote down the numbers. Tr. at 122, 145, 149. Eight numbers were retrieved from one pager, while six numbers were retrieved from the other pager. Affirmation of Diarmuid White, Attorney for Reyes, June 29, 1995 ("White Aff."), Ex. F.[10] The agents then returned the pagers to Salazar, and Salazar left. Tr. at 124, 146.

On Sunday, December 4 at around 10:30 p.m., pursuant to a search warrant, two ATF agents (Horne and Dugan) searched a box of items in the basement storage department of the Miami Hilton Hotel. Tr. at 157, 166, 206, 218–19. This box contained items found in Reyes' hotel room on the night he was arrested. Tr. at 159. During that search, Agent Dugan found another pager (Pager #3). Tr. at 159, 167. Agent Horne testified that she did not remember whether that pager was turned on when Dugan found it. Tr. at 219. Dugan testified that the pager *was* on, as evidenced by a series of lines across the video display. Tr. at 159, 167. After finding the pager, Dugan "put the side button in the vibrational mode" and attempted to retrieve messages from it. Tr. at 160, 167. There were no messages in the pager at that time. Tr. at 160, 168. Horne kept Pager #3 in her hotel room overnight. Tr. at 219.

The next morning, Dugan and two others met with Horne in Horne's hotel room to examine what they had found the night before. Tr. at 160–161. Dugan placed Pager #3 on a coffee table. Tr. at 161. At around 9:30 a.m., the pager (still in vibrational mode) went off. Tr. at 161, 168. When it began vibrating, Dugan "recorded the telephone number that was indicated on the" pager. Tr. at 161, 219. In order to record the number, Dugan pressed an access button. Tr. at 161. Dugan continued to record messages that came across the pager over the next four days, while the pager was in his possession. Tr. at 161, 168. Dugan record-

ed approximately 97 messages from the pager during that time. Tr. at 169–70; *see also* White Aff., Ex. G.[11]

### B. How Pagers Work

According to Agent Murphy, pagers usually have a black button. When the pager is turned on, pushing that button either reveals a signal that there are no pages or displays the last number. Pushing the button again reveals the next to last number, and so on. Tr. at 123, 345. Turning off the pager erases the pager's memory. Pagers have a limited storage capacity. Murphy testified that the storage capacity of Reyes' pagers was probably ten numbers. Tr. at 123–24. In addition to telephone numbers, the pagers were used to store numerical codes that could be interpreted as coded messages. Tr. at 150; Def. Mem. at 27. These numbers/messages could contain up to 16 digits. Def.Mem. at 27; *see also* White Aff., Ex. F.

### C. Reyes' Pagers

Defendant Reyes moves for suppression of the numbers that the ATF agents obtained from the pagers they seized from Reyes at the time of (and two days after) his arrest. Reyes argues that both the Fourth Amendment and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.* compel the granting of his motion.

As an initial matter, the seizure of two of the pagers was constitutional. Pager #1 was seized incident to a valid arrest, and Pager #2 was seized in the course of a vehicle search to which the car's driver had consented. By contrast, for the reasons set forth above, Pager #3 was illegally seized. However, in order to provide an alternative holding, I shall assume, for this purpose only, that the seizure of Pager #3 was proper. Even though the seizures were proper, "an officer's authority to possess a package is distinct from his authority to examine its contents." *Walter v. United States*, 447 U.S. 649, 654, 100 S.Ct. 2395, 2400, 65 L.Ed.2d 410 (1980). Moreover, the Court accepts Reyes'

---

**10.** It is not clear from the exhibit which pager was retrieved from the car and which pager was retrieved from the bag attached to Reyes' wheelchair.

**11.** Reyes states (Def.Reply Mem. at 18) that 78 messages were retrieved from Pager #3. However, the evidence in the record suggests that closer to 100 messages were retrieved.

assertion, unopposed by the Government, that he had a reasonable expectation of privacy in the contents of his pagers' memories. *United States v. Chan*, 830 F.Supp. 531, 535 (N.D.Cal.1993); *United States v. Blas*, 1990 WL 265179, No. 90–CR–162, at *21 (E.D.Wis.1990).

### 1. Fourth Amendment

#### a. *Pager # 1*

As stated above, the seizure of Pager # 1 resulted from a search incident to Reyes' lawful arrest. Tr. at 12, 17. Under *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), when making a lawful arrest, police may conduct a warrantless search of the area within the arrestee's immediate control. When searching a container that is seized incident to arrest, "the general requirement for a warrant prior to the search of a container does not apply." *Chan*, 830 F.Supp. at 536 (citing *New York v. Belton*, 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)). However, in some instances, law enforcement agents may require a separate warrant to search a container seized incident to a lawful arrest. *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). In *Chadwick*, the defendant was arrested with a large footlocker by federal narcotics agents at a train station. While some agents took Chadwick to a federal building, other agents followed with the footlocker. From the moment of Chadwick's arrest, "the footlocker remained under the exclusive control of law enforcement officers at all times." *Id.* at 3–4, 97 S.Ct. at 2479. Ninety minutes after the arrest, and without a warrant, the agents opened the footlocker. *Id.* at 4, 97 S.Ct. at 2479. The Court ruled that under these circumstances, the search of the footlocker could not be considered incident to Chadwick's arrest and that the agents were therefore required to obtain a search warrant. *Id.* at 15, 97 S.Ct. at 2485. The *Chan* court summarized this holding by declaring that the *Chadwick* Court "adopted a narrow exception to the incident to arrest doctrine, holding that a warrantless search of seized property cannot be justified when the search is remote in time or place from the arrest." *Chan*, 830 F.Supp. at 535 (citing *Chadwick*, 433 U.S. at 13–15, 97 S.Ct. at 2484–85).

In the instant case, Agent Coad accessed the memory of Pager # 1 soon after another agent seized the pager from the bag attached to Reyes' wheelchair. While no witness testified as to the precise time of Reyes' arrest and the time that Agent Coad accessed the memory of Pager # 1, given the events described as taking place during that period, it is hard to imagine that more than twenty minutes elapsed. The search of Pager # 1's memory was not at all remote in time or place from Reyes' arrest. Therefore the narrow *Chadwick* exception does not apply, and the search of the memory of Pager # 1 was a valid search incident to Reyes' arrest. The Fourth Amendment does not require the suppression of numbers retrieved from that pager.[12]

#### b. *Pager # 2*

As stated above, Pager # 2 was lawfully seized in the course of a vehicle search to which the driver of the car consented. Agent Murphy testified that he asked Salazar if Salazar minded if he [Murphy] looked in the car. Tr. at 118. Agent Coad similarly testified that he and Murphy asked Salazar if they could look inside the car. Both Murphy and Coad testified that Salazar allowed them to search the car. Tr. at 118, 132, 144. Coad found Pager # 2 in the back seat of the car. Tr. at 121, 144. The issue presented here is whether the scope of Salazar's consent to search the car encompassed Coad's warrantless search of the memory of Pager # 2.

The only case to address this issue in the context of pagers or similar devices is *United States v. Galante*, 1995 WL 507249, 94 CR 633 (S.D.N.Y. Aug. 25, 1995). In *Galante*, three agents were led to a car containing a driver and a passenger. One agent asked the occupants to get out of the car, asked the

---

**12.** Because the Court holds that the accessing of Pager # 1's memory was a valid search incident to arrest, the Court need not decide whether exigent circumstances justified Coad's retrieval of the numbers from Pager # 1 under the Fourth Amendment.

driver if the car was his, and asked if the agents could search the car. The driver said that the car was his and consented to the search. The search yielded a cellular telephone and a pager. One of the agents extracted a telephone number from both the pager and the telephone.[13] *Id.* at *2.

In arguing that the consent of the car owner to the search did not include consent to search the contents of the cellular telephone and pager, the defendant in *Galante* relied on *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). That case involved a police officer who stopped a car, told the driver (Jimeno) that he had reason to believe there were narcotics in the car, and asked Jimeno for permission to search the car. *Jimeno,* 500 U.S. at 249, 111 S.Ct. at 1802. Jimeno consented, and the officer's search yielded a kilogram of cocaine. *Id.* at 249–50, 111 S.Ct. at 1802–03. The Supreme Court held that where Jimeno granted permission to search without placing "any explicit limitation on the scope of the search," and where the officer had told Jimeno that he would be looking for narcotics, "it was objectively reasonable for the police to conclude that the general consent to search [Jimeno's] car included consent to search containers within that car which might bear drugs." *Id.* at 251, 111 S.Ct. at 1803. The Court thus allowed the cocaine to be admitted as evidence against Jimeno.

The defendant in *Galante* cited *Jimeno* for the proposition that because there was no evidence that the agents told any of the occupants of the car what they were searching for, general consent to search did not include consent to search the memory of the cellular telephone and pager. The *Galante* court refused to interpret *Jimeno* in this manner. *Galante,* 1995 WL 507249, at *3. Rather, the *Galante* court looked to *United*

States v. Snow, 44 F.3d 133 (2d Cir.1995), in which the Second Circuit interpreted *Jimeno* to mean "that a defendant's lack of knowledge of what the searching officer is searching for does not change the effect of a general consent." *Id.* (citing *Snow,* 44 F.3d at 135). The *Snow* court held that one who consents to a search of a car "should reasonably expect that readily-opened, closed containers discovered inside the car will be opened and examined." *Snow,* 44 F.3d at 135. The *Galante* court thus declined to suppress the number obtained from the search of the pager and the cellular telephone, citing the absence of any testimony that those items could not be readily "opened." *Galante,* 1995 WL 507249, at *3, *3 n. 4.

Here, as in *Galante,* there is no evidence to suggest that either Coad or Murphy told Salazar what they were looking for. Therefore, according to *Snow,* Salazar's general consent must be taken to include consent to search the memory of Pager # 2. The Fourth Amendment does not require the suppression of numbers retrieved from that pager.[14]

### c. *Pager # 3*

■■■ The third pager was found among the items taken from Reyes' hotel room to the basement storage department of the Miami Hilton Hotel. Tr. at 167, 219. Agents Dugan and Horne testified that they found the pager late Sunday night, that the pager was on when they found it, that Horne kept the pager in her hotel room overnight, that the pager began to sound at 9:30 a.m. Monday, and that they retrieved approximately 97 numeric messages from the pager over the course of four days. Tr. at 168, 219, 277. Reyes testified that he left the third pager turned off. Tr. at 346.

---

13. The agent extracted the number from the cellular telephone by pressing a recall key. The opinion does not specify whether the agent obtained the number from the pager by observing it already on the display screen or by pressing a button to retrieve the number. The opinion refers once to the number as being *in* the pager, thus implying that the number was not already observable on the pager's display screen; once to the number as being *on* the pager; and once to "the extraction of information from [the pager]." *Id.* at *2–3. Whether or not the agent had to

press a button in order to read the number from the pager, the pressing of a button to access the memory of Pager # 2 in Reyes' case is analogous to the pressing of the recall key on the cellular telephone in *Galante.*

14. As with Pager # 1, the Court need not reach the issue of exigent circumstances. The accessing of Pager # 2's memory was constitutional as part of the consent search of the Town Car.

The Government argues that exigent circumstances justified the agents' retrieval of numeric messages from Pager # 3. Gov't Mem. at 21–22 (citing *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (en banc), *cert. denied*, 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *United States v. Zabare*, 871 F.2d 282, 289–92 (2d Cir.), *cert. denied*, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989)). Specifically, the Government notes that pagers have a limited memory, and that Pager # 3 "would refuse to accept incoming messages if its storage capacity was full." Affirmation of Laurie Horne in Support of Government's Response to Defendants' Pretrial Motions, Aug. 1, 1995, ¶ 6. In pointing out that "confederates and co-conspirators of [drug] traffickers" frequently leave messages on the pagers of suspects following an arrest, the Government implicitly argues that the pager messages could provide critical evidence or investigatory leads. *Id.*

In response, Reyes emphasizes his testimony that he left Pager # 3 turned off. Tr. at 346. Reyes then argues that because the agents turned on the pager, they themselves created any exigency. Therefore, Reyes argues, the Government cannot claim the benefit of the exception to the warrant requirement for exigent circumstances. The Eighth Circuit has held that

> [u]nder the exigent circumstances exception, the warrant requirement is suspended "when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed . . . The police themselves, however, cannot create the exigency."

*United States v. Johnson*, 12 F.3d 760, 764 (8th Cir.1993), *cert. denied*, ── U.S. ──,

114 S.Ct. 2689, 129 L.Ed.2d 821 (1994) (citing *United States v. Duchi*, 906 F.2d 1278, 1282 (8th Cir.1990)). The Second Circuit initially took this view in *United States v. Segura*, 663 F.2d 411, 415 (2d Cir.1981), but later circumscribed its position, deciding that "when law enforcement agents act in an entirely lawful manner, they do not impermissibly create exigent circumstances." *MacDonald*, 916 F.2d at 772. The issue then becomes whether Dugan's act of turning on Pager # 3 (assuming, as Reyes argues, that Dugan did so) was a lawful act. The search warrant for the storage department at the Miami Hilton did not authorize the agents to access the memory of Reyes' pager. *See* White Aff., Ex. B. Because no exception to the warrant requirement was applicable under these circumstances (for example, the search was not incident to Reyes' arrest, nor was it a consent search), if Dugan turned the pager on, that act was unlawful.

If Dugan was accurate in testifying that Pager # 3 was on when he found it at 10:30 p.m. Sunday, then the following would also be true: despite the fact that the pager had received *no* messages from 1 p.m. Friday afternoon (when Reyes left his hotel room; Tr. at 343) [15] until 9:30 a.m. Monday morning (Tr. at 219)—a span of more than 68 hours—starting on Monday morning, the pager received approximately 100 messages over the next four days (Tr. at 170). This is a rate of approximately 25 pages per day.

Such a scenario is highly improbable. I therefore conclude that Dugan's testimony is not credible. Dugan must have turned on the pager on Monday morning, while handling the pager (*see* Tr. at 278) before he placed it on the coffee table in Horne's room.[16] Consequently, Dugan himself creat-

---

15. No witness testified as to the means by which the contents of Reyes' hotel room were transported from the room to the hotel storage department. Nonetheless, the Government bears the burden of proving the existence of exigent circumstances, *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984), and I find it more probable than not that no hotel personnel adjusted the pager in the course of transporting the contents of Reyes' hotel room. Therefore, I conclude that if Dugan's testimony that the pager was already on when he found it Sunday evening is to be credit-

ed, then I must also find that the pager was on when Reyes left his room on Friday afternoon.

16. Reyes testified that Pager # 3 was a duplicate (*i.e.* had the same phone number) of one of the pagers seized at the time of his arrest. Tr. at 344. I find this implausible, given that Reyes brought both (ostensibly duplicate) pagers with him to Miami, rather than leaving one in New York. Tr. at 344–45. In any event, a finding that the pagers were duplicates is unnecessary to my finding that Pager # 3 was turned on when Dugan and Horne found it.

ed the exigency through the unlawful act of turning on Pager # 3. Dugan "creat[ed], or at least greatly increas[ed] the risk that evidence would be destroyed." *Johnson,* 12 F.3d at 765. Therefore, the agents cannot claim the benefit of the exigent circumstances exception, and the retrieval of numeric messages from Pager # 3 was unconstitutional.[17] *See MacDonald,* 916 F.2d at 772. Reyes' motion to suppress those numbers is granted.

### 2. Electronic Communications Privacy Act

In addition to the Fourth Amendment challenges to the retrieval of numbers from Reyes' pagers, Reyes also asserts that such retrieval violated the Electronic Communications Privacy Act ("ECPA"). In 1986, the ECPA amended the Omnibus Crime Control and Safe Streets Act of 1968, commonly referred to as the Federal Wiretap Act.[18] *Steve Jackson Games, Inc. v. United States Secret Service,* 36 F.3d 457, 460 (5th Cir. 1994). Title I of the ECPA proscribes " 'intentionally intercept[ing] . . . any wire, oral, or electronic communication', unless the intercept is authorized by court order." *Id.* (citing 18 U.S.C. § 2511(1)(a)). By contrast, Title II of the ECPA "generally proscribes unauthorized access to stored wire or electronic communications." *Steve Jackson,* 36 F.3d at 462. The first question, is whether the conduct of the ATF agents amounted to intercepting electronic communications or to accessing stored electronic communications.

Only one case has addressed precisely this distinction. In *Steve Jackson,* the Fifth Circuit analyzed the language of the ECPA as follows. In order to understand what it means to intercept an electronic communication, one must first examine the relevant statutory definitions. Interception means "the aural or other acquisition of the contents of any wire, electronic, or oral communication

through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). An electronic communication is "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system . . . but does not include . . . any wire or oral communication. . . ."[19] 18 U.S.C. § 2510(12). Electronic storage means "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof. . . ." 18 U.S.C. § 2510(17).

Therefore, intercepting an electronic communication essentially means acquiring the *transfer* of data. Taken together, the definitions thus imply a requirement that the acquisition of the data be simultaneous with the original transmission of the data. As the *Steve Jackson* court stated,

> Congress' use of the word "transfer" in the definition of "electronic communication" and its omission in that definition of the phrase "any electronic storage of such communication" (part of the definition of "wire communication") reflects that Congress did not intend for "intercept" to apply to "electronic communications" when those communications are in "electronic storage."

36 F.3d at 461–62. To be sure, the *Steve Jackson* decision was issued in the context of the seizure of a computer on which were stored e-mail messages that had been sent to an electronic bulletin board but not yet read (retrieved) by the intended recipients. 33 F.3d at 460. However, the court's reasoning applies with equal force to the instant case, in that agents seized pagers and accessed the pagers' memories, which contained numeric messages not yet read (retrieved) by the intended recipient. Retrieving numbers from the memory of a pager, then, is more

---

**17.** The Court further observes that at no point during the four days that the agents retrieved numbers from Pager # 3 did the agents attempt to obtain a warrant authorizing them to access the pager's memory.

**18.** Specifically, the ECPA amended Title III of the Federal Wiretap Act. Court orders described

by and issued under the Federal Wiretap Act are known as Title III warrants.

**19.** Unlike the definition of wire communications, electronic communications do not include "any electronic storage of such communication[s]." *See* 18 U.S.C. § 2510(1) (definition of wire communication).

accurately described as accessing electronic communications that are in electronic storage than intercepting electronic communications. The Sixth Circuit, which is the only court yet to address precisely whether pressing a button on a pager to access the pager's memory constitutes an interception within the meaning of the ECPA, has decided that such action is not an interception. *United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990).[20]

Consequently, in retrieving numbers from the pagers' memories, the agents in this case accessed stored electronic communications. The accessing of stored electronic communications is governed by Title II of the ECPA, 18 U.S.C. § 2701 *et seq.*[21] *Steve Jackson*, 36 F.3d at 462. "Generally, a search warrant, rather than a court order, is required to obtain access to the contents of a stored electronic communication." *Id.* at 462 n. 7; *see also* 18 U.S.C. § 2703(a). As a result, the

same exceptions to the warrant requirement apply to this section as apply to any other warrantless search. Therefore, since this Court has already determined that the agents legally accessed the memories of Pagers # 1 and # 2 under exceptions to the warrant requirement, neither of those searches violated the ECPA. Because neither the Fourth Amendment nor the ECPA makes illegal the retrieval of numbers from the memories of Pager # 1 and Pager # 2, the numbers retrieved from those pagers are admissible against Reyes.

■ However, because the agents were not justified under the Fourth Amendment in retrieving numbers from the memory of Pager # 3, that search did violate the ECPA. Exclusion of the evidence is not an available remedy for this violation of the ECPA, *see* 18 U.S.C. §§ 2515, 2708, but the evidence from Pager # 3 is being suppressed in any event

---

**20.** Reyes correctly points out what may be perceived as flaws in the reasoning of the *Meriwether* court. For one thing, the court enumerates several rationales for deciding that pressing a pager button is not an interception under the ECPA, but does not specify which rationale it adopts. The reasons the court gives include that: (i) retrieval of a number from a pager's memory is not an interception because the transmission of the number to the pager had ceased; (ii) the agent who pressed the pager button became a party to the communication, and there can be no interception when a party to a communication records that communication; and (iii) the agent did not acquire the contents of the communication by a proscribed method, that is, by electronic, mechanical or other device as proscribed by the definition of "intercept" (simply pressing the digital display button and then visually observing the telephone numbers, the court stated, did not constitute the use of an electronic, mechanical or other device). *Meriwether*, 917 F.2d at 960. With regard to the third rationale, this Court agrees with Reyes that in fact pressing a button on the pager does constitute the use of an electronic or mechanical device. However, the Court is constrained by the use of the word "transfer" in the definition of "electronic communication," and is persuaded by the reasoning of the *Steve Jackson* court on this issue.

Another flaw that Reyes observes is that the *Meriwether* court began its opinion by stating that a "digital display pager, by its very nature, is nothing more than a contemporary receptacle for telephone numbers." 917 F.2d at 958. This Court explicitly disagrees with this proposition (*see* page 832, *supra* ); numerical codes may be transmitted to a pager that impart messages to the recipient. Nonetheless, this Court does not

think that the above-described flaws render unsound the basic holding of *Meriwether*—that pressing a button on a pager to access its memory is not an "interception" within the meaning of the ECPA.

Both Reyes and the Government also cite *Brown v. Waddell*, 50 F.3d 285 (4th Cir.1995). The facts of that case differ from those at issue here. In *Brown*, investigators used a duplicate (clone) digital display pager, which allowed them "to receive any numeric messages sent to [the suspect's] pagers at the same time that they were received and displayed on [the suspect's] pagers." 50 F.3d at 287, 294. The *Brown* court held that such a technique "cannot be considered the use of a 'pen register' within the meaning of the ECPA," and consequently decided that the use of clone pagers is an interception under the ECPA. *Id.* While not directly applicable to the instant case, the *Brown* holding reinforces this Court's conclusion that for purposes of the ECPA, an "interception" must acquire data simultaneously with the transmission of the data.

**21.** Section 2701 of the ECPA states that

Except as provided in subsection (c) of this section whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
(2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished....
18 U.S.C. § 2701(a).

because the warrant authorizing the search of the hotel lost and found department was not supported by probable cause, and because the memory of Pager #3 was accessed in violation of the Fourth Amendment. The remedy for violation of Title II of the ECPA, set forth in 18 U.S.C. § 2707, lies in a civil action against the person or entity who violated the statute.[22]

## V. *Reyes' Post–Arrest Statements*

▮▮▮ Reyes concedes that on the evening of December 4, prior to his interrogation at the MCC, Agent Horne read the *Miranda* warnings to him, he signed an acknowledgment to this effect and he agreed to be questioned. Tr. at 354. Nonetheless, Reyes contends that while his waiver of rights and his statements were knowingly made, they were involuntary due to the circumstances of his confinement. By the time he was interrogated, Reyes had been in custody for approximately 43 hours without being arraigned. During that time, he received no medical attention, despite complaining to the prison authorities that he believed he had a urinary tract infection. Tr. at 351–352. Because of his physical condition (paraplegia), he was unable to shower or use the facilities. Tr. at 355. Reyes testified that he agreed to be questioned because he wanted to get out of the MCC as soon as possible and be sent to a place better suited to accommodate someone in his condition. Tr. at 355.

On the other hand, Reyes does not claim that he informed Agent Horne and the New York investigators of his urinary tract infection. Tr. at 354–55, 366. In fact, Agent Horne testified that Reyes stated that he wasn't sick and didn't want to be in a hospital with sick people, in response to Agent Horne's statement that the New York prisons have hospitals. Tr. at 218. And while Reyes testified that he was "drained" (Tr. at 355), he does not claim that he was confused or unable to think clearly during his questioning by the agents. Tr. at 354–55, 366. Under the circumstances, the credible evidence does not establish that Reyes was so exhausted and confused that his statements were involuntary.

Section 3501 of Title 18 requires a court to consider five factors in assessing voluntariness: (1) the time lapse between arrest and arraignment of the defendant making the statement; (2) whether the defendant knew the nature of the offense with which he was charged or of which he was suspected; (3) whether the defendant was advised or knew that he was not required to make any statement and that any statement could be used against him; (4) whether the defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether the defendant was without the assistance of counsel when questioned. Reyes concedes that factors 2, 3, and 4 must be decided in the Government's favor. With respect to factor 5, while Reyes did not have counsel at the interview, he was clearly advised of his right to counsel and chose not to request an attorney.

The only factor requiring any discussion is the first factor, namely the length of time between arrest and arraignment. Here, the delay in arraignment was caused by the fact that the federal courts in Miami were closed for the weekend. Reyes was not taken to the MCC until 11:45 p.m. on Friday night. *See* Gov't Mem. at 28. This Circuit has held that a prearraignment delay due to the unavailability of a Magistrate Judge over a weekend may be reasonable. *United States v. Rubio*, 709 F.2d 146, 153–54 (2d Cir.1983) (defendant's statement held admissible although it was made nearly two days after weekend arrest where, except for quite reasonable periods of time actually spent in processing and routine questioning, the hours between arrest and arraignment were spent mainly in lodging at the MCC while awaiting arraignment).

I find that in this instance the delay in bringing Reyes to a Magistrate was reasonable considering all of the circumstances.

---

22. The statute authorizes an award of "the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case ... less than the sum of $1,000." 18 U.S.C. § 2707(c); *see also Steve Jackson*, 36 F.3d at 460 n. 5. If he wishes to sue, Reyes must commence an action no "later than two years after the date upon which [he] first discovered or had a reasonable opportunity to discover the violation." 18 U.S.C. § 2707(e).

The courts were closed for the weekend, the arraignment could not be conducted at the Magistrate's home and Reyes was a particularly difficult prisoner to transport given his physical disabilities. Because I do not believe the delay was unreasonable, I conclude that Reyes' statements were voluntary and should not be suppressed.

## VI. *Reyes' Remaining Arguments*

### A. Constitutionality of 21 U.S.C. § 848(b)(2)(A)

 Defendant Reyes challenges the validity of 21 U.S.C. § 848(b)(2)(A) on the ground that the statute is unconstitutionally vague. This statute must be read in conjunction with 21 U.S.C. § 841(b)(1)(B), which imposes a five-year minimum jail sentence for offenses involving five grams or more of cocaine base (that is, crack cocaine), while not imposing the same five-year minimum sentence for offenses involving powder cocaine unless the offense involves 500 grams or more. Section 848(b)(2)(A) takes the amounts designated in § 841(b)(1)(B) and imposes a mandatory life sentence if the violation "involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B)." [23]

As the Government points out, every circuit court (including the Second Circuit) "that has considered a constitutional vagueness challenge to the distinction between 'cocaine' and 'cocaine base' has rejected that challenge." Gov't Mem. at 50. *See United States v. Jackson,* 968 F.2d 158, 161 (2d Cir.), *cert. denied,* 506 U.S. 1024, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992); *see also United States v. Jackson,* 64 F.3d 1213, 1219 (8th Cir.1995); *United States v. Thomas,* 932 F.2d 1085, 1090 (5th Cir.), *cert. denied,* 502 U.S. 895, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991); *United States v. Turner,* 928 F.2d 956, 960 (10th Cir.), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991); *United States v. Avant,* 907 F.2d 623, 625–27 (6th Cir.1990); *United States v. Van Hawkins,* 899 F.2d 852, 854 (9th Cir.1990); *United States v. Barnes,*

890 F.2d 545, 552–53 (1st Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *United States v. Williams,* 876 F.2d 1521, 1525 (11th Cir. 1989); *United States v. Brown,* 859 F.2d 974, 975–77 (D.C.Cir.1988). This Court is bound by the voluminous precedent established by this Circuit and others, and rejects Reyes' challenge to the sentencing provisions that distinguish between crack cocaine and powder cocaine.

### B. The Indictment's References to the "Reyes Crew"

 Reyes seeks redaction of the term "Reyes Crew" from the indictment pursuant to Fed.R.Crim.P. 7(d), asserting that the term is surplusage and unduly prejudicial. It is well-settled in this Circuit that "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (quoting *United States v. Napolitano,* 552 F.Supp. 465, 480 (S.D.N.Y.1982)). *Scarpa* sets forth a two-pronged test that a defendant must meet to prevail in striking an allegation: (1) evidence of the challenged allegation must be inadmissible and irrelevant to the charge, and (2) the allegation must be prejudicial and inflammatory.

 Here, the references to the "Reyes Crew" are both prejudicial and inflammatory. If a RICO enterprise or RICO conspiracy were established at trial, Reyes would face an insurmountable task in convincing the jury that he was not a member of the enterprise or conspiracy bearing his name. Similarly, the challenged allegation is neither admissible nor relevant. In its Memorandum, the Government states that it intends to prove that Reyes was the organizer and undisputed leader of a criminal enterprise engaged in large-scale narcotics trafficking, the murder of perceived rivals and other acts of violence. Gov't Mem. at 31. However, the

---

**23.** The indictment of Reyes charges him with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, and alleges that the underlying violation "involved in excess of 300 times the quantity of a substance described in Section 841(b)(1)(B) of Title 21, United States

Code, to wit, in excess of 1500 grams of mixtures and substances containing detectable amounts of cocaine base." Second Superseding Indictment, 1/25/95, ¶ 57. Therefore, if convicted of this charge, Reyes would face a mandatory sentence of life imprisonment under § 848(b)(2)(A).

Government appears to concede that the term "Reyes Crew" was not used by the members of the enterprise. *Id.* Thus, while the Government may prove that Reyes was an organizer and leader of the enterprise, the made-up term "Reyes Crew" is neither admissible nor relevant.

### C. Reyes' and Rodriguez' Request for a Wade Hearing

Both Reyes and Rodriguez seek a *Wade* hearing with respect to certain identification procedures employed by the Government. The disclosure of information regarding pretrial identification procedures at this stage would be tantamount to the disclosure of a list of the Government's witnesses. The defendants are not entitled to such discovery at this stage. Prior to a witness' testimony, the Government must disclose whether the witness made a pretrial identification of any of the defendants and the circumstances under which the identification was made. The defendants may then request that the Court conduct an inquiry outside the presence of the jury as to whether such identification testimony should be suppressed.

### VII. *Rodriguez' Request for Consolidation or Severance*

Rodriguez asks that this indictment be consolidated with the indictment in *United States v. Garcia*, 94 Cr. 1003 (LMM), 1996 WL 51197. Failing that, he asks that his trial be severed from that of his co-defendants. The consolidation motion must be denied. As disclosed by the Government in its Memorandum, the *Garcia* case charges a narcotics conspiracy and two firearms counts, but no murders. The *Reyes* case, by contrast, charges a narcotics conspiracy and a RICO enterprise responsible for seven murders. The *Garcia* case, involving 23 defendants, will require proof with respect to the day-to-day operation of the narcotics conspiracy in which all of the 23 defendants were involved. The *Reyes* case, involving three defendants, will require proof of the details of seven murders. Under the circumstances, these indictments should not be consolidated as it would create an extremely long and possibly confusing trial.

By the same token, judicial economy requires that Rodriguez be tried together with his co-defendants. Rodriguez is charged with the commission of two murders in furtherance of the racketeering enterprise charged in Count One of the indictment. The Government intends to prove that Rodriguez was a trusted member of the enterprise. Much of the proof of the existence and operations of the enterprise will be relevant to Rodriguez. Severing his case would require a substantial duplication of effort. Thus, a severance is denied. *See United States v. Werner*, 620 F.2d 922, 929 (2d Cir.1980) (requirement of substantial prejudice to justify severance arises from policy underlying Rule 8 that prejudice to defendant is outweighed by gains in trial economy when requirements of rule are met).

### CONCLUSION

In sum, all of Reyes' motions to suppress are granted with the exception of the motions to suppress the numbers retrieved from Pagers #1 and #2 and his post-arrest statements; those are denied. The remainder of Reyes' motions are denied, with the exception of his motion to strike the term "Reyes Crew" from the indictment, which is granted. Rodriguez' motion for consolidation or a severance is denied.

SO ORDERED.