Morgan v. Turn-Pro Maint. Servs., LLC, 2020 NCBC 5.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 1905

JOSHUA MORGAN, both
Individually and Derivatively on
Behalf of ALPINE WASTE
SOLUTIONS, LLC,

              Plaintiff,

v.

TURN-PRO MAINTENANCE
SERVICES, LLC; ROBERT
SINGLETARY; and ALPINE WASTE
SOLUTIONS, LLC,

              Defendants.

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.      **THIS MATTER** is before the Court upon (i) Defendant Robert Singletary's ("Singletary") Motion for Summary Judgment (the "Singletary Motion"), (ECF No. 49), and (ii) Plaintiff Joshua Morgan's ("Morgan") Motion for Summary Judgment (the "Morgan Motion"), (ECF No. 41), both individually and derivatively on behalf of Alpine Waste Solutions, LLC ("Alpine" or the "Company"), in the above-captioned case (collectively, the "Motions").

2.      Having considered the Motions, the related briefing, and the arguments of counsel at the hearing on the Motions, the Court (i) **DENIES** the Singletary Motion; and (ii) **GRANTS in part** and **DENIES in part** the Morgan Motion.

*Alexander Ricks, PLLC, by Alice C. Richey, for Plaintiff Joshua Morgan, both individually and derivatively, on behalf of Alpine Waste Solutions, LLC.*

*Robert M. Singletary, pro se.*

Bledsoe, Chief Judge.

## FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion for summary judgment, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue[.]" *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

4. Morgan and Singletary formed Alpine in 2014 to provide trash collection and general maintenance services for property management companies and apartment complexes. (V. Compl. ¶ 9, ECF No. 3; Second Aff. Robert M. Singletary ¶¶ 11, 13 [hereinafter "Singletary 2nd Aff."], ECF No. 52.)

5. Morgan and Singletary are the only two members of Alpine, and each holds a 50% ownership interest in the Company. (V. Compl. Ex. A; Pl.'s Mot. Summ. J. Ex. 1, at ¶¶ 5–7, 37 [hereinafter "Morgan Aff."], ECF No. 41.1; Singletary 2nd Aff. ¶ 12.) Alpine does not have a written operating agreement, (Morgan Aff. ¶ 7; Pl.'s Mot. Summ. J. Ex. 2, at 13:11–14:5 [hereinafter "Singletary Dep."], ECF No. 41.2), and is no longer in business, (Morgan Aff. ¶ 47, Ex. S; *see also* Singletary 2nd Aff. ¶ 30).

6. Singletary served as Alpine's member-manager and handled the Company's day-to-day operations while it conducted business. (V. Compl. ¶ 10; Morgan Aff. ¶ 10; Singletary 2nd Aff. ¶ 15; Singletary Dep. 13:11–13, 14:20–15:6.) Morgan provided Alpine's initial funding and had a more passive role in the Company's operations. (Morgan Aff. ¶ 7; Singletary 2nd Aff. ¶ 12.)

7. Alpine enjoyed some early success. In late 2015, the Company obtained service contracts with three properties managed by Ardmore Residential, Inc. ("Ardmore"): (1) King's Grant Apartments, LLC, dated October 7, 2015; (2) The Retreat at the Park, LLC, dated October 12, 2015; and (3) Howell Road, LLC, dated October 2, 2015 (collectively, the "Ardmore Contracts"). (Morgan Aff. ¶¶ 15–17, Exs. B–D; Singletary 2nd Aff. ¶ 17.) Building on that success, a few months later, Alpine entered into a service contract dated March 7, 2016 with Grubb Properties, Inc. ("Grubb Properties") to provide services at Grubb Properties' LangTree Lake Norman Apartments property (the "Grubb Contract"). (Morgan Aff. ¶ 14, Ex. A; *see also* Index Exhibits Referenced Second Aff. Robert M. Singletary Ex. F [hereinafter, "Index Singletary 2nd Aff."], ECF No. 53.)

8. Beginning in 2016, the relationship between Morgan and Singletary deteriorated, with each suspecting the other of misusing Alpine's assets. According to Morgan, beginning in April 2016, Singletary caused Alpine to pay for Singletary's personal expenses, including groceries, meals, rent, and a personal loan to Singletary's brother, in the total amount of $4,987.29. (Morgan Aff. ¶¶ 28–29; *see also* Morgan Aff. Exs. G (Alpine bank statements) and H (Alpine operating account transaction list).) Morgan also claims that Singletary made false statements to Alpine's customers to excuse Alpine's poor performance, including a statement that Singletary's "business partner" was to blame for Alpine's failures and that "a business partner was being removed from Alpine." (V. Compl. ¶¶ 18–20; Morgan Aff. ¶ 30, Ex. I.) For his part, Singletary alleges that Morgan made an unauthorized withdrawal

of $1,000 from Alpine's operating account on April 25, 2016, (Singletary 2nd Aff. ¶ 23), and failed to pay Alpine approximately $2,500 Singletary contends Morgan owed the Company, (Singletary 2nd Aff. ¶ 24).

9. Apparently in response to this deteriorating relationship, Singletary, while still the member-manager of Alpine, created Turn-Pro Management Services, LLC ("Turn-Pro") on May 13, 2016 to provide the same services as Alpine. (V. Compl. ¶¶ 21–22, 24; Morgan Aff. ¶ 31, Ex. J; Singletary 2nd Aff. ¶¶ 31–32; Singletary Dep. 75:19–25, 217:9–22.) Singletary was and remains Turn-Pro's sole member and manager. (V. Compl. ¶ 23; Morgan Aff. ¶ 31, Ex. J.)

10. Singletary candidly acknowledges that while acting as Alpine's member-manager, he transferred funds, contracts, and assets of Alpine to Turn-Pro without Morgan's knowledge or consent. (Singletary Dep. 54:3–25, 74:12–75:18, 77:20–23, 86:16–24, 105:9–106:2, 216:8–217:25.) For example, Singletary transferred funds from Alpine's operating account to Turn-Pro on May 19, 2016 and again on May 25, 2016 in the amounts of $1,200.00 and $1,750.00, respectively. (V. Compl. ¶ 25; Morgan Aff. ¶ 33, Ex. O; Singletary Dep. 216:8–217:22.) That same month, Singletary transferred Alpine's "insurance polic[ies]" to Turn-Pro. (V. Compl. ¶ 27; Morgan Aff. ¶ 34, Ex. P; Singletary Dep. 217:9–22.) Most significantly, Singletary assigned Alpine's Ardmore and Grubb Contracts to Turn-Pro—executing assignment documents on behalf of both Alpine and Turn-Pro—all without Morgan's knowledge or consent. (V. Compl. ¶ 26; Morgan Aff. ¶¶ 32, 41, Exs. K–N; Singletary Dep. 54:3–25, 74:12–75:18, 77:20–23, 86:16–24, 217:9–22, 219:1–222:25; Index Singletary 2nd

Aff. Ex. F.)  As a result of Singletary's actions, Alpine had no assets by June 2016.  (Morgan Aff. ¶ 35.)

11.    After the assignment of the Grubb Contract, Turn-Pro began providing services for Grubb Properties in May and June 2016 for which Turn-Pro received payment.  Turn-Pro did not remit any of these sums to Alpine.  (Morgan Aff. ¶¶ 40–41; Singletary Dep. 105:9–106:2.)  Alpine also received funds from Ardmore under the Ardmore Contracts during this time.  Although Ardmore's payments under these contracts were paid to Alpine, Singletary transferred the paid funds from Alpine to Turn-Pro without consideration to Alpine.  (Morgan Aff. ¶¶ 33, 41, Ex. O; Singletary Dep. 105:9–106:2.)

12.    At some point in June 2016, Morgan became aware of Singletary's conduct, and, on June 15, 2016, e-mailed Ardmore and Grubb Properties to advise that Singletary's transfers of the Ardmore and Grubb Contracts to Turn-Pro were unauthorized and invalid.  (V. Compl. ¶ 29; Morgan Aff. ¶¶ 36–38; Singletary 2nd Aff. ¶ 35; Index Singletary 2nd Aff. Ex. D, at 13–16, Ex. E.)

13.    Ardmore and Grubb Properties soon expressed confusion and frustration over whether Alpine or Turn-Pro was to service their contracts and to which entity they were to send their communications, complaints, and payments.  (Singletary 2nd Aff. ¶ 44; Index Singletary 2nd Aff. Ex. D, at 18, Ex. J, at 37.)  Shortly thereafter, Grubb Properties cancelled the Grubb Contract by "back-dat[ing]" a letter cancelling the contract on May 1, 2016 as to be effective June 1, 2016, (Singletary 2nd Aff. ¶ 44; Index Singletary 2nd Aff. Ex. F), and, on July 11, 2016, Ardmore cancelled the

Ardmore Contracts, (Morgan Aff. ¶ 40, Ex. R; Singletary 2nd Aff. ¶ 43; Index Singletary 2nd Aff. Ex. D, at 21). Ardmore also ceased consideration of a fourth contract with Alpine—to provide services for Ardmore's Cates Creek apartment complex—around this same time. (Morgan Aff. ¶¶ 22, 40, Ex. R; Singletary 2nd Aff. ¶ 43; Singletary Dep. 105:1–106:13; Index Singletary 2nd Aff. Ex. D, at 21.)

14. The cancellation of the Ardmore and Grubb Contracts eliminated Alpine's and Turn-Pro's primary sources of revenue, quickly leading to the deterioration of both businesses. Morgan and Singletary thereafter exchanged demands and counter-demands, as discussed below. Their inability to resolve their dispute ultimately led Morgan to commence this litigation in January 2018. Shortly thereafter, on February 28, 2018, Alpine was administratively dissolved for failure to file an annual report. (Morgan Aff. ¶ 47, Ex. S.)

## II.

## PROCEDURAL BACKGROUND

15. Prior to the commencement of this litigation, Morgan's counsel sent a Chapter 57D records and information demand (the "Records Demand") on June 8, 2016 addressed to Singletary at 4404 Firwood Lane, Charlotte, N.C. 28209 ("Charlotte Address"), asking Singletary, as Alpine's managing member, to permit inspection of certain of Alpine's records and information no later than June 22, 2016. (V. Compl. ¶¶ 31–32, Ex. B; Singletary 2nd Aff. ¶ 33.) Singletary confirmed that Alpine received the Records Demand, (Singletary 2nd Aff. ¶ 33), and it is undisputed

that Singletary did not respond or provide the requested documents or information, (Morgan Aff. ¶ 32).

16.    On August 10, 2017, Morgan's counsel mailed a letter (the "Demand Letter") by first class mail, addressed to Alpine, in care of Singletary as Alpine's managing member, at the Charlotte Address, (V. Compl. Ex. A; Pl.'s Reply Supp. Mot. Summ. J. All Claims & Countercls. [hereinafter "Pl.'s Reply"] Ex. A, at ¶¶ 3–6, Ex. 1 [hereinafter "Traynum Aff."], ECF No. 55.1), demanding that Alpine remedy certain alleged misconduct that Morgan claimed had been "facilitated by [Singletary] with regard to the Company[,]" (V. Compl. Ex. A; *see also* Morgan Aff. ¶ 46). That same day, Morgan's counsel sent the Demand Letter by e-mail to Singletary, again as Alpine's managing member, to the e-mail address rob@singletarygroup.com. (Traynum Aff. ¶ 7, Ex. 2.) Significantly for purposes of these Motions, Singletary contends that he, and thus Alpine, never received the Demand Letter from Morgan in any form. (Singletary 2nd Aff. ¶¶ 7–8, 10; Br. Supp. Def.'s Mot. Summ. J. 2–3, ECF No. 51; Aff. Robert M. Singletary [hereinafter "Singletary 1st Aff."] ¶¶ 6–7, 9, ECF No. 50.)

17.    On January 29, 2018, Morgan filed this action, in both his individual capacity and derivatively on behalf of Alpine, against Turn-Pro, Singletary, and Alpine. Morgan asserted (i) derivative claims against Singletary for breach of fiduciary duty, constructive fraud, and conversion; (ii) a derivative claim against Turn-Pro for constructive trust; (iii) derivative claims against Singletary and Turn-Pro for tortious interference with contract, tortious interference with prospective

economic advantage, usurpation of corporate opportunities, unfair and deceptive trade practices under N.C.G.S. § 75-1.1, and punitive damages; (iv) an individual claim against Alpine for the exercise of information rights under N.C.G.S. § 57D-3-04; and (v) individual and derivative claims against Alpine for judicial dissolution under N.C.G.S. § 57D-6-02. (V. Compl. 6–16.)

18. On May 25, 2018, Singletary, for himself and on behalf of Alpine, and Alpine, in its own name, filed their Answer to the Complaint and asserted counterclaims against Morgan for breach of contract, breach of fiduciary duty, unfair and deceptive trade practices under section 75-1.1, violation of N.C.G.S. § 57D-4-05, tortious interference with contract, violation of N.C.G.S. §§ 14-453, 454, 456, and 458, and violation of the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510-22, for which they sought actual and punitive damages, attorneys' fees and costs, and judicial dissolution of Alpine under N.C.G.S. § 57D-6-02. (Mot. Dismiss & Ans. All Defs. & Derivative & Direct Countercls. Alpine [hereinafter "Defs.' Mot. Dismiss"], ECF No. 16.)

19. On January 30, 2019, Alpine withdrew its counterclaim against Morgan for breach of fiduciary duty. (ECF No. 34.)

20. On April 4, 2019, Morgan dismissed his section 75-1.1 claim without prejudice, (ECF No. 38), and on May 9, 2019, dismissed his claims for conversion, usurpation of corporate opportunities, constructive trust, and for information rights under section 57D-3-04, also without prejudice, (ECF No. 40).

21.     On May 9, 2019, Morgan filed the Morgan Motion, (ECF No. 41), and on June 10, 2019, Singletary, acting *pro se*, filed the Singletary Motion, (ECF No. 49). In support of his Motion, Singletary also filed two affidavits he signed under oath, his first on June 10, 2019, (Singletary 1st Aff.), and his second on June 11, 2019, with an accompanying index of exhibits, (Singletary 2nd Aff.; Index Singletary 2nd Aff.).

22.     After full briefing, the Court held a hearing on the Motions on July 23, 2019, at which Morgan was represented by counsel, Singletary appeared *pro se*, and Turn-Pro did not appear.[1]  The Motions are now ripe for resolution.

### III.

### LEGAL STANDARD

23.     Under Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. R. Civ. P. 56(c).  "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense."  *CSX Transp.,*

---

[1] Turn-Pro was originally represented by counsel in this action, but upon proper motion, the Court permitted Turn-Pro's counsel to withdraw by order dated February 20, 2019.  No successor counsel has appeared.  As an unrepresented limited liability company, Turn-Pro was precluded from *pro se* participation in the hearing under well-established North Carolina law.  *See, e.g.*, *LexisNexis, Div. of Reed Elsevier, Inc. v. Travishan Corp.*, 155 N.C. App. 205, 209, 573 S.E.2d 547, 549 (2002) (holding "a corporation must be represented by a duly admitted and licensed attorney-at-law and cannot proceed *pro se*"); *see also, e.g.*, *Carter v. Maximov*, No. COA10-1408, 2011 N.C. App. LEXIS 1767, at *7–8 (N.C. Ct. App. Aug. 16, 2011) (dismissing appeal in part because non-attorney plaintiff could not represent corporation in litigation).

*Inc. v. City of Fayetteville*, 247 N.C. App. 517, 521, 785 S.E.2d 760, 763 (2016) (citation omitted). " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' and means 'more than a scintilla or a permissible inference.' " *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558, 799 S.E.2d 269, 271 (2017) (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335, 777 S.E.2d 272, 278–79 (2015)).

24.    Under Rule 56, "[e]vidence presented by the parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) (citation omitted); *see also Smith v. Beasley*, 298 N.C. 798, 801, 259 S.E.2d 907, 909 (1979) ("It is the function of the jury alone to weigh the evidence, determine the credibility of the witnesses and the probative force to be given their testimony, and determine what the evidence proves or fails to prove."). The movant bears the burden of showing that no genuine issue of material fact exists. *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). The moving party can meet this burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense" or by showing "through discovery that the opposing party cannot produce evidence to support an essential element of [his or] her claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). If the moving party meets its burden, then "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Patel v. Scottsdale Ins. Co.*, 221

N.C. App. 476, 480, 728 S.E.2d 394, 397 (2012) (quoting *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000)).

IV.

ANALYSIS

A.     Singletary's Motion for Summary Judgment

25.     Singletary moves for summary judgment on all of Morgan's derivative claims and opposes the Morgan Motion on those same claims on the ground that Morgan failed to make a proper pre-suit demand as required under N.C.G.S. § 57D-8-01(a)(2).  (Def.'s Mot. Summ. J. 1, ECF No. 49.)  That provision requires that prior to asserting a derivative claim, an LLC member must have:

> made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period.

N.C.G.S. § 57D-8-01(a)(2).  " 'A party's standing to bring a derivative claim depends on' compliance with 'the demand requirement' in N.C. Gen. Stat. § 57D-8-01(a)(2)." *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *20 (N.C. Super. Ct. Oct. 2, 2017), *aff'd*, 371 N.C. 579, 821 S.E.2d 711 (2018) (quoting *Petty v. Morris*, 2014 NCBC LEXIS 67, at *4 (N.C. Super. Ct. Dec. 16, 2014)).

26.     Here, Singletary offers his own sworn testimony averring that he never received the Demand Letter, either by first class mail, e-mail, or otherwise.  (Br. Supp. Def.'s Mot. Summ. J. 2–3; Singletary 1st Aff. ¶¶ 6–7, 9; Singletary 2nd Aff. ¶¶ 7–8, 10.)  Singletary also offers evidence he contends shows that Morgan failed to

mail the Demand Letter to his and Alpine's correct address, asserting that Alpine changed its address on August 4, 2017 from the Charlotte Address to an address in Clemmons, North Carolina ("Clemmons Address"). (Br. Supp. Def.'s Mot. Summ. J. 2–3; Singletary 1st Aff. ¶¶ 6, 9; Singletary 2nd Aff. ¶¶ 7, 10.)

27. In opposition, Morgan has offered unrebutted evidence that his counsel placed the Demand Letter in first class mail on August 10, 2017 addressed to Alpine, in care of Singletary, at the Charlotte Address, (V. Compl. Ex. A; Traynum Aff. ¶¶ 3–6, Ex. 1), the address reflected in Alpine's latest annual report (filed July 1, 2016), (Pl.'s Reply Ex. B, Ex. 1, ECF No. 55.2). Morgan also offers unrebutted evidence that his counsel e-mailed the Demand Letter on August 10, 2017 to rob@singletarygroup.com, (Traynum Aff. ¶ 7), the e-mail address Singletary has used to communicate successfully with the Court in this matter.

28. The Motions require the Court to determine what constitutes proper demand under section 57D-8-01(a)(2). Although section 57D-8-01(a)(2) specifically requires a derivative demand on an LLC to be in writing, it does not specify the manner in which the demand must be delivered. N.C.G.S. § 55D-33(d) deals with service on entities through registered agents, the situation here, and provides that "[n]othing in this section affects the right to serve any process, notice or *demand* required or permitted by law to be served upon an entity in any . . . manner now or hereafter permitted by law." (emphasis added). Under section 57D-8-01(a)(2), "[d]elivery is *not* required to be by registered or certified mail." *Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *26 (N.C. Super. Ct. Jan. 27, 2017)

(emphasis added) (citing *Petty*, 2014 NCBC LEXIS 67, at \*18). In the corporation context, " '[n]otice' includes demand[,]" N.C.G.S. § 55-1-40(15), and "[n]otice may be communicated . . . by electronic means[ ] or by mail or private carrier[,]" N.C.G.S. § 55-1-41(b). Against this backdrop, the Court concludes that Morgan's demand through first class mail and e-mail were permissible methods of delivery for purposes of section 57D-8-01(a)(2).

29. Implicit within the statute's language is the requirement that the written demand be delivered, *see Miller*, 2017 NCBC LEXIS 6, at \*26, and delivery to the LLC must be made through its registered agent or to "a person or entity that has authority to cause the LLC to reject the demand." Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.04[5], at n.61.1 (7th ed. 2018); *see also Hilco Transp., Inc. v. Atkins*, 2016 NCBC LEXIS 5, at \*13 (N.C. Super. Ct. Jan. 15, 2016) (requiring that proper demand be addressed to "someone with authority to act on behalf of the corporation"); *Petty*, 2014 NCBC LEXIS 67, at \*17 (concluding that "any response . . . must be made by those with authority to act on behalf of the corporation").

30. The demand requirement exists to give a corporation or LLC the opportunity "to remedy the alleged problem without resort to judicial action, or, if" resolution requires judicial action, "to bring suit first against the alleged wrongdoers." *Zoutewelle v. Mathis*, 2018 NCBC LEXIS 95, at \*18 (N.C. Super. Ct. Sept. 13, 2018) (quoting *Bridges v. Oates*, 167 N.C. App. 459, 467–68, 605 S.E.2d 685, 691 (2004)). Since demand is required to permit the LLC to take corrective action, it follows that

the LLC must receive the demand to fulfill that statutory purpose. *See, e.g.*, *Kane v. Moore*, 2018 NCBC LEXIS 157, at \*34–35 (N.C. Super. Ct. Nov. 26, 2018) (finding pre-suit demand untimely based on LLC's receipt and rejection of demand); *Miller*, 2017 NCBC LEXIS 6, at \*27 (finding relevant receipt of demand); *Petty*, 2014 NCBC LEXIS 67, at \*9 (same).

31. It is undisputed that Morgan mailed and e-mailed the Demand Letter to Singletary. Singletary, however, has filed three sworn affidavits averring that he did not receive the Demand Letter either at his physical address or by e-mail. (Singletary 1st Aff. ¶¶ 6–7, 9; Singletary 2nd Aff. ¶¶ 7–8, 10; Third Aff. Robert M. Singletary ¶ 6 [hereinafter "Singletary 3rd Affidavit"], ECF No. 58.1.) The issue therefore is whether Morgan's evidence of mailing, and Singletary's sworn denials, create a genuine issue of material fact precluding summary judgment for either Singletary or Morgan.

32. North Carolina recognizes that for "mail properly addressed and stamped, the law presumes the addressee received it." *Sherrod v. Ins. Ass'n*, 139 N.C. 167, 169, 51 S.E. 910, 911 (1905); *see also Gore v. Myrtle/Mueller*, 362 N.C. 27, 48, 653 S.E.2d 400, 413 (2007) ("[T]he law is that evidence of the mailing of a letter, properly addressed and with proper postage, raises a rebuttable presumption that the letter was received by the intended recipient." (citing *Beard v. S. Ry. Co.*, 143 N.C. 136, 140, 55 S.E. 505, 506 (1906))); *Crown Cent. Petroleum Corp. v. Page-Myers Oil Co.*, 255 N.C. 167, 171, 120 S.E.2d 594, 598 (1961) ("[I]f the letter was written and mailed . . . , there is a *prima facie* presumption that it was received." (citations omitted)).

33.    Many courts have concluded that denial of receipt alone is insufficient to overcome the presumption of receipt for Rule 56 purposes. *See, e.g.*, *McLaughlin v. Astrue*, 443 F. App'x 571, 574 (1st Cir. 2011) (holding that for denial of applications for disability and supplemental security income benefits, "it is fairly well-accepted that affidavits that merely . . . allege non-receipt within the five days [after the notice] are not sufficient, standing alone, to rebut the presumption" (citations omitted)); *Isaacson v. N.Y. Organ Donor Network*, 405 F. App'x 552, 553 (2d Cir. 2011) (holding that "[t]he mere denial of receipt does not rebut [the] presumption" at the summary judgment stage (citation omitted)); *United States v. Ekong*, 518 F.3d 285, 287 (5th Cir. 2007) (per curiam) (concluding that "[t]he addressee's 'bare assertion of non-receipt' is insufficient to rebut the assumption" (citation omitted)); *Bean v. Perdue*, 316 F. Supp. 3d 220, 230 (D.D.C. 2018) (concluding a plaintiff's "bare assertion of non-receipt . . . is not sufficient to raise a genuine dispute of fact regarding whether [the defendant] sent the Response Letter"); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 578 (W.D.N.C. 2000) (concluding that a "[p]laintiff's affidavit, in which he simply denies receipt of the [arbitration] notice, is insufficient to undermine the presumption of receipt" (citation and internal quotation marks omitted)).

34.    Other courts, however, have concluded to the contrary, reasoning that a person in Singletary's position rarely has affirmative evidence other than a denial and is in a difficult position to prove a negative, that of non-receipt. *See Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314, 321–22 (3d Cir. 2014) ("[E]vidence sufficient to nullify the presumption of receipt . . . may consist solely of the addressee's positive

denial of receipt, creating an issue of fact for the jury" because "where . . . receipt of a letter is a contested issue, the individual recipient is forced to prove a negative[,]" and "[t]he law has long recognized that such an evidentiary feat is next to impossible."); *Seminiano v. Xyris Enter., Inc.*, 512 F. App'x 735, 735 (9th Cir. 2013) (disagreeing with "the categorical proposition" that "a simple denial of receipt is insufficient to rebut the presumption of receipt" because, "depending on the circumstances, that presumption can be rebutted by a credible sworn declaration of non-receipt." (citation omitted)); *In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985) ("Testimony of non-receipt, standing alone, would be sufficient to support a finding of non-receipt; such testimony is therefore sufficient to rebut the presumption of receipt.").

35. North Carolina appears to have cast its lot with these latter courts, concluding that "[e]vidence of nonreceipt of the letter by the addressee . . . is *some evidence* that the letter was not mailed and raises a question of fact for the trier of fact." *Wilson v. Claude J. Welch Builders Corp.*, 115 N.C. App. 384, 386, 444 S.E.2d 628, 629 (1994) (emphasis added) (citations omitted). In this case, the evidence appears overwhelming that the derivative demand was delivered to Singletary. The letter was properly addressed and both mailed and e-mailed to his current addresses, was never returned, and was never the subject of an e-mail or post office undeliverable message. There is no evidence that Singletary failed to receive any other email at the rob@singletarygroup.com address or any other mail at the Charlotte Address or the Clemmons Address through USPS mail forwarding.

Nevertheless, Singletary has provided affirmative evidence of nonreceipt through his sworn testimony, and the Court concludes North Carolina precedent holds such evidence sufficient to raise a question of fact for the jury on that issue.

36. Accordingly, both the Singletary Motion on Morgan's derivative claims and the Morgan Motion seeking the entry of judgment on each of those same claims must be denied on this ground.

B. Morgan's Motion for Summary Judgment

37. Morgan, individually and derivatively on behalf of Alpine, seeks entry of judgment on his remaining claims against Defendants and dismissal of all counterclaims asserted against him. (Pl.'s Mot. Summ. J, ECF No. 41.) Morgan currently maintains derivative claims against Singletary for breach of fiduciary duty and constructive fraud and against Singletary and Turn-Pro for tortious interference with contract and tortious interference with prospective economic advantage, for which he seeks actual/compensatory and punitive damages and attorneys' fees. (Pl.'s Mem. Law Supp. Mot. Summ. J. All Claims & Countercls. 7–14 [hereinafter "Pl.'s Mem. Law"], ECF No. 42.) Morgan acknowledges that his individual and derivative claim for Alpine's judicial dissolution is moot because Alpine has already been administratively dissolved.

38. While the Morgan Motion on his derivative claims must be denied due to the issue of fact concerning whether Singletary received the Demand Letter, the Court nevertheless addresses Morgan's claims on this Motion to narrow the issues that

must be resolved by a jury at trial. Thereafter, the Court addresses the Morgan Motion on Singletary and Alpine's counterclaims.[2]

### 1. Morgan's Breach of Fiduciary Duty Claim

39. Morgan alleges that Singletary, as Alpine's manager, breached his fiduciary duties to Alpine by, among other things, using Alpine's funds for personal use, creating Turn-Pro to perform Alpine's work for his own benefit, transferring money from Alpine's bank account to Turn-Pro, and transferring the Ardmore and Grubb Contracts, as well as Alpine's insurance policies, to Turn-Pro, which resulted in the cancellation of Alpine's contracts by Alpine's customers. (Pl.'s Mem. Law 7–8.)

40. "In order to establish a claim for breach of fiduciary duty, plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to plaintiff." *See Miller*, 2017 NCBC LEXIS 6, at *23 (citing *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006)). A manager of an LLC owes a fiduciary duty to the LLC. *Id.* (citing N.C.G.S. § 57D-3-21(b)); *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009) ("[M]anagers of a limited liability company . . . owe a fiduciary duty to the company[.]"). Since Singletary was a member-manager of the Company, (V. Compl. ¶ 4; Morgan Aff. ¶ 7; Singletary 2nd Aff. ¶ 5), Singletary owed fiduciary duties to Alpine.

41. As a fiduciary, a "manager shall discharge [his or her] duties (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under

---

[2] For ease of reference, the Court shall refer hereafter to the counterclaims asserted directly by Alpine and derivatively by Singletary on Alpine's behalf as "Alpine's counterclaims."

similar circumstances, and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC." N.C.G.S. § 57D-3-21(b). Singletary, by his own admission, and Morgan, through other undisputed evidence, have demonstrated that Singletary openly breached his fiduciary duties to Alpine through numerous acts Singletary brazenly committed while he was the member-manager of Alpine, including:

(1) his creation of Turn-Pro, an entity he wholly-owned, and his use of Turn-Pro to engage in direct competition with Alpine for which Turn-Pro received payment without consideration to Alpine and without Morgan's knowledge or consent, (V. Compl. ¶¶ 21–24; Morgan Aff. ¶ 31, Ex. J; Singletary 2nd Aff. ¶¶ 31–32; Singletary Dep. 75:19–25, 217:9–22);

(2) his transfer of the Ardmore and Grubb Contracts to Turn-Pro without consideration to Alpine and without Morgan's knowledge or consent, (V. Compl. ¶ 26; Morgan Aff. ¶¶ 32, 41, Exs. K–N; Singletary Dep. 54:3–25, 74:12–75:18, 77:20–23, 86:1–24, 217:9–22, 219:1–222:25; Index Singletary 2nd Aff. Ex. F);

(3) his transfer of funds earned and paid to Alpine under Alpine's service contracts to Turn-Pro without consideration to Alpine and without Morgan's knowledge or consent, (Morgan Aff. ¶¶ 33, 41, 43–44, Ex. O; Singletary Dep. 105:9–106:2, 216:8–217:22, 219:1–222:25); and

(4) his transfer of Alpine's insurance policies to Turn-Pro without consideration to Alpine and without Morgan's knowledge or consent, (V. Compl. ¶ 27; Morgan Aff. ¶ 34, Ex. P; Singletary Dep. 217:9–25).

42. It is also undisputed that Singletary's actions caused Alpine to suffer substantial injury, including through the loss (and eventual cancellation) of the Ardmore and Grubb Contracts, (Morgan Aff. ¶¶ 32, 40, Exs. N, R; Singletary Dep. 54:3–25; Index Singletary 2nd Aff. Ex. D, at 21), the loss of the Cates Creek opportunity with Ardmore, (Morgan Aff. ¶¶ 22, 40, Ex. R; Singletary 2nd Aff. ¶ 43; Singletary Dep. 108:14–25), and the loss of Alpine assets, including funds from Alpine's bank accounts and sums due on customer contracts later paid to Turn-Pro, (Morgan Aff. ¶¶ 33, 41, 43, Ex. O; Singletary Dep. 105:9–106:2, 216:8–217:22, 219:1–222:25).

43. Accordingly, should a jury conclude that Singletary received the Demand Letter, the Court concludes that summary judgment is proper establishing Singletary's liability on Morgan's claim for breach of fiduciary duty.

### 2. Morgan's Constructive Fraud Claim

44. To establish constructive fraud, a plaintiff must allege facts and circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9, 812 S.E.2d 831, 837 (2018) (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)). Additionally, a plaintiff must

allege that, through the defendant's misconduct, the defendant sought to benefit himself and the plaintiff was injured. *Nelson v. Alliance Hosp. Mgmt., LLC*, 2011 NCBC LEXIS 43, at \*22 (N.C. Super. Ct. Nov. 22, 2011) (citation omitted); *see also Hauser v. Hauser*, 252 N.C. App. 10, 16, 796 S.E.2d 391, 395 (2017) ("The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." (quoting *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004))).

45.     As discussed above, Morgan has established Singletary's breach of fiduciary duty. To establish his claim for constructive fraud, Morgan must also show through undisputed evidence that Singletary benefited himself through his misconduct. Morgan more than meets his burden here because each of the listed actions supporting breach (i.e., Singletary's transfers of Alpine's contracts and funds to his wholly-owned entity Turn-Pro) directly benefited Singletary as sole owner of Turn-Pro at the expense of Alpine. Viewing the record in the light most favorable to Singletary, the Court concludes that, should a jury conclude that Singletary received the Demand Letter, summary judgment should be entered establishing Singletary's liability for constructive fraud as a matter of law.

### 3.     Morgan's Tortious Interference with Contract Claim

46.     To establish a claim for tortious interference with contract, a plaintiff must prove:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2)

the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (quoting *United Labs., Inc v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

47. Morgan contends here that Singletary tortiously interfered with Alpine's Ardmore and Grubb Contracts as a matter of law. The Court agrees. It is undisputed that those contracts were valid and binding, (Morgan Aff. ¶¶ 13–18, Exs. A–D; Singletary 2nd Aff. ¶ 17; Index Singletary 2nd Aff. Ex. F), that Singletary knew of them as Alpine's member-manager, (V. Compl. ¶¶ 13, 26; Morgan Aff. ¶¶ 10, 32, 41, Exs. I, K–N; Singletary 2nd Aff. ¶¶ 15, 17; Singletary Dep. 54:3–25, 77:20–23, 86:16–24, 217:9–22, 219:1–222:25; Index Singletary 2nd Aff. Ex. F), that Singletary intentionally induced Ardmore and Grubb not to perform the contracts with Alpine, (Morgan Aff. ¶ 32, Exs. K–N; Singletary 2nd Aff. ¶ 32; Singletary Dep. 54:3–25), that he did so to further his own interest at the expense of Alpine in violation of his legal duties as a member-manager of Alpine, *see, e.g.*, *Childress v. Abeles*, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954) (Malice "denotes the intentional doing of the harmful act without legal justification."); *Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008) ("A complainant must show that the defendant acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of the defending party."), and that Alpine suffered actual damage as a result, (V.

Compl. ¶ 26; Morgan Aff. ¶¶ 32, 35, 41, 43–45, Exs. K–N; Singletary Dep. 54:3–25, 77:20–23, 86:16–24, 217:9–22, 219:1–222:25).

48. Viewing the record in the light most favorable to Singletary, the Court concludes that, should a jury conclude that Singletary received the Demand Letter, summary judgment is properly entered establishing Singletary's liability on Morgan's claim for tortious interference with contract as a matter of law.

### 4. Morgan's Tortious Interference with Prospective Economic Advantage Claim

49. "To state a claim for wrongful interference with prospective advantage, [a plaintiff] must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 17, at *23 (N.C. Super. Ct. Mar. 6, 2017) (quoting *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000)). "Mere expectation of a continuing business relationship is insufficient"; rather, "a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Beverage Sys.*, 368 N.C. at 701, 784 S.E.2d at 463 (citing *Dalton v. Camp*, 353 N.C. 647, 655, 548 S.E.2d 704, 710 (2001)).

50. The undisputed evidence shows that Ardmore directed Alpine to write a contract for Ardmore's Cates Creek property on June 1, 2016. (Morgan Aff. ¶¶ 22, 40, Ex. E.) The undisputed evidence further shows that Ardmore canceled the Ardmore Contracts and ceased negotiating the Cates Creek contract just a month later in July 2016 due to "the continuing confusion and problems with Alpine[,]"

(Index Singletary 2nd Aff. Ex. D, at 21; *see also* Morgan Aff. ¶¶ 22, 40, Ex. R; Singletary 2nd Aff. ¶ 43; Singletary Dep. 108:14–25), problems caused by Singletary's unauthorized and unilateral assignment of the Ardmore Contracts to Turn-Pro. As a result, the undisputed evidence establishes that but for Singletary's tortious interference with Alpine's Cates Creek contract negotiations, Alpine would have successfully reached an agreement for that property with Ardmore.

51. Viewing the record in the light most favorable to Singletary, the Court concludes that, should a jury conclude that Singletary received the Demand Letter, summary judgment is properly entered establishing Singletary's liability on Morgan's claim for tortious interference with prospective economic advantage as a matter of law.

### 5. Morgan's Claim for Actual/Compensatory Damages

52. Morgan seeks entry of judgment as to his actual/compensatory damages on each of his affirmative claims for relief. Singletary acknowledged at his deposition that Alpine's future net profits on its Ardmore and Grubb Contracts, calculated over five years, would total $439,546.95. He also acknowledged that Alpine would have received annual revenue of $38,880.00 for the prospective Cates Creek contract, or $194,400.00 over a five-year period. (Singletary Dep. 107:1–108:13, 113:1–114:13; *see also* Morgan Aff. ¶¶ 22, 27; Pl.'s Mem. Law 12.) Morgan seeks judgment in these total amounts, (Pl.'s Mem. Law 12), but without calculating the present value of these income streams. Because Morgan is seeking to be paid today the full value of a net income stream into the future, the Court concludes that judgment in the amount

sought is not proper and that damages must be based on net present value after the presentation of evidence and, if appropriate, expert testimony. Accordingly, the Morgan Motion shall be denied to this extent.

53. Morgan also seeks damages of $4,987.29 for Singletary's unauthorized purchases and misuse of Alpine's operating account. (Pl.'s Mem. Law 12.) Morgan's proffered evidence, however, consisting of numerous bank statements and debit card and operating account transactions attached as Exhibits G and H to his Motion, does not clearly identify which transactions he claims are unauthorized and why. The Court thus denies the Morgan Motion as to these sums.

54. Finally, Morgan claims damages to Alpine of $2,950.00 for Singletary's unauthorized payments from Alpine to Turn-Pro. (Pl.'s Mem. Law 12.) It is undisputed that Singletary transferred $2,950.00 via checks from Alpine's operating account to Turn-Pro on May 19 and 25, 2016 without Morgan's knowledge or consent. (Morgan Aff. ¶ 33, Ex. O; Singletary Dep. 216:8–217:22.) As such, the Court concludes that, should a jury conclude that Singletary received the Demand Letter, entry of judgment for Alpine in the amount of $2,950 is proper as a matter of law for these payments.

### 6. Morgan's Claim for Punitive Damages

55. Morgan also seeks entry of judgment as to punitive damages. In light of the Court's conclusions concerning actual/compensatory damages above, and given that the Court concludes that a reasonable jury could, but is not required to, find that Singletary has engaged in fraud, malice, or willful or wanton conduct sufficient to

entitle Morgan and Alpine to punitive damages, the Court will deny Morgan's motion as to punitive damages and defer the issue of punitive damages to a jury at trial.

### 7.   Alpine's Counterclaims

56.   Morgan also moves for summary judgment dismissing each of Alpine's counterclaims against him with prejudice.   Like Morgan's dissolution claim, Singletary's claim for judicial dissolution is moot and shall be dismissed.   The Court addresses Alpine's other counterclaims in turn.

### a.   Breach of Contract

57.   First, Alpine contends that Morgan breached Alpine's operating agreement by contacting Alpine customers and making statements to customers damaging to Alpine.   (Defs.' Mot. Dismiss 26–28.)   "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Brennan Station 1671, LP v. Borovsky*, 821 S.E.2d 640, 645 (N.C. Ct. App. 2018) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)).   Here, there is no written operating agreement, but it is undisputed that the parties orally agreed that Singletary and Morgan would be Alpine's only members, that Singletary would act as manager and manage Alpine's day-to-day affairs, and that section 57D would supply the operating agreement's terms.   (Morgan Aff. ¶¶ 6–7, 10); *see also* N.C.G.S. § 57D-1-03(23) ("[An] operating agreement may be in any form, including written, oral, or implied, or any combination thereof.").

58.   The undisputed evidence requires dismissal of Alpine's counterclaim. Nothing in the parties' oral agreement or in Chapter 57D prohibited Morgan from

contacting Alpine's customers, and the only evidence of Morgan's communications with customers does not support Alpine's contention that such communications were detrimental to Alpine. To the contrary, the undisputed evidence shows that Morgan's communications were consistent with the parties' oral operating agreement and intended to protect Alpine's contracts from Singletary's ultimately successful (and improper) efforts to move those contracts from Alpine to Turn-Pro. As such, Alpine has failed to offer any evidence to support its breach of contract counterclaim against Morgan, and that claim must therefore be dismissed.

b. Section 75-1.1

59. Alpine next asserts an unfair and deceptive trade practices claim under section 75-1.1 against Morgan for allegedly removing funds from Alpine's checking account, presenting false invoices to customers of Alpine, and improperly contacting Alpine's customers. (Defs.' Mot. Dismiss 24–26.) N.C.G.S. § 75-1.1(a) makes plain, however, that "[u]nfair methods of competition *in or affecting commerce*, and unfair or deceptive acts or practices *in or affecting commerce*, are declared unlawful." (emphasis added). The Supreme Court of North Carolina has recognized that "any unfair or deceptive practices . . . solely related to the internal operations of[ ] a business will not give rise to a claim under the Act" because " '[t]hey are not . . . "in or affecting commerce[.]" ' " *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010) (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594–95, 403 S.E.2d 483, 493 (1991)).

60.   Alpine's section 75-1.1 counterclaim reflects a purely internal dispute between Alpine's two members over the authority Singletary and Morgan had to act on behalf of Alpine. As such, Morgan's alleged conduct is not "in or affecting commerce," and Alpine's section 75-1.1 claim must therefore be dismissed.

c.   N.C.G.S. § 57D-4-05

61.   Alpine also asserts a claim for violation of section 57D-4-05, (Defs.' Mot. Dismiss 29), which states: "No distribution may be made by an LLC if, after giving effect to the distribution, either of the following would occur: (1) The LLC would not be able to pay its debts as they become due in the ordinary course of business. (2) The LLC's total liabilities would exceed the value of the LLC's assets." N.C.G.S § 57D-4-05(a). "If a distribution is made in violation of G.S. 57D-4-05, then each manager or other company official who alone or with other company officials had the authority to and did approve the distribution is personally liable to the LLC[.]" *Id.* § 57D-4-06(a). Nevertheless, "a proceeding under this subsection is barred unless it is commenced *within two years after the distribution* [at issue]." *Id.* (emphasis added).

62.   It is undisputed that the allegedly improper distribution here occurred on May 2, 2016, (Defs.' Mot. Dismiss 29), and that Alpine's answer and counterclaim under section 57D-4-05 was first filed over two years later, on May 25, 2018, (ECF No. 16). The counterclaim thus is time-barred and must be dismissed on this basis.

d.   Tortious Interference with Contract

63.   Alpine alleges that Morgan tortiously interfered with Alpine's contracts by inducing Alpine's customers to terminate their contracts with Alpine. (Defs.' Mot.

Dismiss 30–31.) The Court has set forth in section IV.4.B above the elements of a claim for tortious interference with contract under North Carolina law. Elements three (that the defendant intentionally induced the third person not to perform the contract) and four (that in so doing the defendant acted without justification) are of interest here. *See Beverage Sys.*, 368 N.C. at 700, 784 S.E.2d at 462.

64. Specifically, there is no evidence in the record that suggests that Morgan sought to cause Alpine's customers not to perform their contracts with Alpine. To the contrary, it is undisputed that all of Morgan's outreach to third parties was to induce Alpine's customers to perform their contracts with Alpine. Alpine has failed to proffer evidence from which a jury could reasonably conclude that Morgan intentionally induced a third person not to perform a contract with Alpine, requiring dismissal of this counterclaim.

65. Moreover, there is no evidence that Morgan's acts were anything other than a "reasonable and bona fide attempt" to protect Alpine's legitimate business interests, and there is no evidence that Morgan acted through means that were unlawful, a further, and independent, basis for dismissal. *See, e.g.*, *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) ("[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful.").

e. N.C.G.S. § 14-458 – Computer Trespass

66. Alpine's next claim for relief is for computer trespass under section 14-458 and its related provisions. This counterclaim is based on the contention that Morgan changed Singletary's password in May 2016 to block him from using the Alpine e-mail account. (Defs.' Mot. Dismiss 31–32.) N.C.G.S. § 14-458(a) provides that "it shall be unlawful for any person to use a computer or computer network without authority and with the intent to" disable, alter, or copy computer data. "[A] person is 'without authority' when . . . the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]" *Id.* § 14-458(a)(6). A claim for violation of this statute must be brought within one year of the alleged trespass. *Id.* § 1-539.2A(b); *id.* § 1-54.

67. Here, Alpine's counterclaim was brought in May 2018, (ECF No. 16), at least two years after the alleged statutory violation, and thus must be dismissed as time-barred. Moreover, it is undisputed that Morgan was the administrator of the Alpine domain and had associated authority to access all of Alpine's e-mail accounts, including Singletary's. (Morgan Aff. ¶ 11.) Those undisputed facts establish that Morgan's alleged conduct was within his authority under the parties' oral operating agreement. As a result, Morgan's conduct did not constitute a violation of section 14-458 as a matter of law and, for this separate reason, Alpine's computer trespass counterclaim must be dismissed.

f.  18 U.S.C. § 2510–22 – Electronic Communications Privacy Act

68.  Alpine also alleges that Morgan violated the federal Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510–22 ("ECPA"), by reviewing Singletary's e-mails after hacking into Singletary's account.  (Defs.' Mot. Dismiss 25–26, 32.)  The ECPA provides "a civil remedy against any person who 'intentionally intercepts' another person's wire, oral, or electronic communications."  *Abraham v. Cty. of Greenville*, 237 F.3d 386, 389 (4th Cir. 2001) (quoting 18 U.S.C. § 2511(1)(a)).  Under the ECPA, "[t]he term 'intercept' means the acquisition of such communications through the use of any 'electronic, mechanical, or other device[,]' " *id.* (quoting 18 U.S.C. § 2510(4)), but does not apply to communications that are in "electronic storage[,]"  *Steve Jackson Games, Inc. v. United States Secret Serv.*, 36 F.3d 457, 461–62 (5th Cir. 1994), including e-mails that have already been received, *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 952 (N.D. Cal. 2014); *see also United States v. Reyes*, 922 F. Supp. 818, 836 (S.D.N.Y. 1996) ("Taken together, the definitions thus imply a requirement that the acquisition of [electronic communications] be simultaneous with the original transmission of the data.").

69.  Alpine contends here only that Morgan reviewed Singletary's e-mails after Singletary had received them, and there is no evidence that Morgan acquired any of Singletary's e-mails simultaneously with their original transmission.  (Morgan Aff. ¶¶ 11, 36.)  As a result, there is no evidence in the record from which a jury could conclude that Morgan violated the ECPA, and this claim, too, must be dismissed as a matter of law.  *See, e.g.*, *NovelPoster,* 140 F. Supp. 3d at 952 ("[R]eading emails that

have already been received in an email account's inbox does not constitute 'interception' under the statute." (citation omitted)).

       g.    <u>Punitive Damages and Costs and Attorneys' Fees</u>

70. Having concluded that each of Alpine's counterclaims should be dismissed, the Court further concludes that Alpine's claim for punitive damages necessarily fails and must likewise be dismissed.

71. Similarly, given the Court's conclusions concerning the validity of Morgan's affirmative claims for relief, the Court concludes that Alpine's claim for attorneys' fees and costs under N.C.G.S. § 57D-8-05—which is based the contention that Morgan's action was "commenced or maintained without cause or for an improper purpose" and included pleadings "not well grounded in fact or . . . not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law"—is wholly without merit and should also be dismissed.

V.

CONCLUSION

72. **WHEREFORE**, based on the foregoing, the Court hereby **ORDERS** as follows:

    a. The Singletary Motion is **DENIED**.

    b. The Morgan Motion seeking dismissal of each of Alpine's counterclaims is **GRANTED**, and those counterclaims are hereby dismissed with prejudice.

c. The Morgan Motion seeking judgment on his own claims is **DENIED**; provided, however, that should a jury conclude that Singletary received the Demand Letter, the Court concludes and rules as follows:

   i. The Morgan Motion seeking to establish Singletary's liability on Morgan's breach of fiduciary duty claim is **GRANTED**;

   ii. The Morgan Motion seeking to establish Singletary's liability on Morgan's constructive fraud claim is **GRANTED**;

   iii. The Morgan Motion seeking to establish Singletary's liability on Morgan's tortious interference with contract claim is **GRANTED**;

   iv. The Morgan Motion seeking to establish Singletary's liability on Morgan's tortious interference with prospective economic advantage claim is **GRANTED**;

   v. The Morgan Motion seeking to establish Singletary's liability on Morgan's claim for judicial dissolution is **DENIED as moot**;

   vi. The Morgan Motion seeking to establish Morgan's actual/ compensatory damages on each of Singletary's claims is **GRANTED in part**, such that Morgan shall have and recover from Singletary damages in the amount of $2,950.00 together with post-judgment interest at the legal rate until the judgment is satisfied, but is otherwise **DENIED**; and

   vii. The Morgan Motion seeking to establish punitive damages as a matter of law is **DENIED**.

**SO ORDERED**, this the 15th day of January, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge